LORRAINE MULLEN, Individually and as Administrator of the Estate of Robert Mullen, Deceased, Plaintiff-Appellee, v. GENERAL MOTORS CORPORATION et al., Defendants-Appellants.

(No. 59808;

First District (3rd Division)—September 4, 1975.

124

James E. Hastings and Peter R. Sonderby, both of Chadwell, Kayser, Ruggles, McGee & Hastings, of Chicago, for appellant Uniroyal, Inc.

Thomas H. Bridgman and Peter J. Mone, both of Baker & McKenzie, of Chicago, for appellant General Motors Corporation.

Perry M. Berke, of Baskin, Server, Berke & Rosenbloom, and Joseph B. Lederleitner, both of Chicago, for appellee.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

On February 9, 1969, Lorraine Mullen and her husband Robert were injured when Mrs. Mullen lost control of their 1967 Chevrolet station wagon and it left the highway and overturned. The immediate cause of the accident was a blowout of the left rear tire. The Mullens brought this action against the General Motors Corporation and Uniroyal, Inc., manufacturers of the vehicle and tire, upon dual theories of strict liability in tort and breach of the implied warranty of fitness. Robert Mullen died prior to the trial, from causes unrelated to the accident. A jury returned verdicts in favor of Lorraine Mullen individually, for $43,700, and as administratrix of her husband's estate, for $8,250. The defendants have appealed from the denial of their motions for a directed verdict, for judgment notwithstanding the verdict and for a new trial.

The defendants contend that the plaintiff's evidence did not establish either the existence of an unreasonably dangerous manufacturing defect or that such a condition was the proximate cause of the tire's failure. Alternatively, they contend that even if her evidence was sufficient to require the presentation of a defense, it was convincingly rebutted by the defendants' own evidence.

██ A preliminary observation is appropriate. In her brief the plaintiff fully recounted the facts, prefaced by the statement that this was required because the "defendants' statement of facts was not limited to only that evidence which supports the verdict and is consistent therewith." That comment reflects a misunderstanding of the standard of review. Under the prevailing rule in Illinois, a defendant is entitled to a directed verdict or a judgment notwithstanding the verdict when all the evidence, viewed in its aspects most favorable to the plaintiff, so overwhelmingly favors the defendant that no contrary verdict based on that evidence could ever stand. While the court must allow all inferences favoring the plaintiff, it must also consider and weigh the evidence which favors the defendants.

Four witnesses gave testimony for the plaintiff relating to the liability issue. Mrs. Mullen described the tire's history. The Mullens purchased the station wagon in October 1966. The left rear tire was one of five which accompanied the car as original equipment. From the time of purchase until the time of the accident, the auto was driven 23,600 miles. The Mullens used it mainly for traveling to and from a suburban railroad station, for shopping, and for pleasure. They had driven it on two extended vacation trips, to Mexico in February 1967 and to Minnesota in September 1968. When the tire blew out they were traveling at a speed of 65 to 70 miles an hour on a highway near Leasburg Spur, Missouri, en route from Chicago to Joplin, Missouri.

The station wagon had not previously been involved in an accident, nor, to Mrs. Mullen's knowledge, had it ever been driven over rough terrain or over curbs, logs, or unusual bumps. It had not been used to haul another vehicle or trailer. Only once had the Mullens experienced trouble with any of the tires on their car. As they were returning from Mexico in 1968, the right rear tire developed a slow leak and was replaced with the spare.

Mrs. Mullen was an experienced driver and aware that tires wear out, but she had paid little attention to the maintenance of the tires. She said that she and her husband had not bought tires in more than a decade, since it was their practice to trade in their car for a new model before it became necessary to replace original equipment. She had at least glanced through the owner's manual and was aware that it recommended the maintenance of certain levels of air pressure and periodic rotation of the tires, but she did not know whether the tires had ever been rotated. At intervals, she would ask gas station attendants to check the tires, but she specified no particular air pressure for them. The tires had never appeared low to her, except the one which had been replaced. Beyond knowing that there was tread on the tires she did not know their condi-

tion. The day before the Mullens departed for Joplin, they left the car at a service station, asking that the oil be changed and the car checked for a trip. Mrs. Mullen did not know the nature of the checkup. She could not say whether the car had been given a safety inspection within the 6 months preceding the accident.

After the accident, the auto was transported 5 miles to a service station. No witness described the manner in which the vehicle was moved this distance. An employee of the service station testified that the front tires were in good condition; but the left rear tire was deflated and missing a piece of its tread, and the right rear tire, although still inflated, had a bulge on the exterior sidewall. In his opinion, the left rear tire had not been run upon while flat. Thinking that the vehicle would be moved again, and believing that, due to the damage to the vehicle's front end, it could only be towed with the front end raised, he marked all the tires to indicate their original positions and then switched the rear tires and wheels to the front and the front tires and wheels to the rear.

Stanley Myers, a professional investigator, picked up the rear tires at the service station, had them photographed, and sent them to be examined by John Reffner, an expert engaged by the plaintiff. Myers noticed a decal on the car door, indicating that the last safety check on the vehicle had been conducted when the odometer showed a mileage of 20,652 miles.

Reffner was the assistant director of the Institute of Material Science at the University of Connecticut. He possessed bachelor and master of science degrees and was working toward a doctorate. His graduate study had been in the areas of rubber and polymer science, chemical microscopy and solid state chemistry. He had worked for a time in the laboratories of the B. F. Goodrich Tire and Rubber Company, testing and performing microscopic examinations of various rubber products, including tires. After joining the University of Connecticut he continued to do tire analysis part time, working for attorneys in civil actions and as consultant to two tire companies.

In April 1969 Reffner received the two rear tires of the Mullen automobile from Myers. They still bore the identifying chalk marks placed on them by the service station attendant in Missouri. Reffner thought that the right rear tire appeared normal and he did not examine it further. The left rear tire he examined visually. He found scuffing and abrasion on the sidewall areas which he testified most probably occurred as a result of the accident. The most significant damage was an opening in the shoulder of the tire carcass, where the interior sidewall met the tread. Above this opening, a piece of sidewall and tread rubber was missing from an area which measured three inches by five inches, along the edge of the

sidewall and reached around to the second tread groove. Reffner viewed this area through a stereobinocular microscope and photographed it close up and in low magnification.

Before explaining his opinion why the tire had failed, Reffner discussed the construction of tires generally. He said that the tread is merely the wearing surface that comes in contact with the road and does not significantly contribute to a tire's total strength. That depends upon a tire's internal structure, which in this case consisted of fabric plies, each made up of parallel cords. To increase strength, the plies are laid on one another so that the parallel cords in one layer cross those in the next layer at right angles. Reffner said that during the tire-building operation the sidewall rubber and tread stock are bonded to the rubber-impregnated fabric plies, usually with "some form of adhesive material." It is essential to the longevity of a tire that various components remain adhered to each other during operation. If not, they will move independently of one another and internal wear will result.

Reffner's opinion was that the blowout had been caused by a defect built into the tire at the time of its manufacture. He characterized this "incipient defect" as "either some void or failure to have proper adhesion." He based this view on the general nature of the failure and on the fact that the tread and other components of the tire were separated from one another, and all showed signs of abrasion. "The wearing is all internal so that the defect must have been internal." He testified, and the plaintiff's exhibits showed, that where the exterior sidewall and tread rubber had been torn away the cords in the fabric plies were frayed and broken. Little if any rubber remained on the surface of the exposed cords of the upper ply. Reffner interpreted this to mean that extensive rubbing together and breakdown of the tire components had occurred before the tread blew off and precipitated the accident. In his view, stresses built up at the location of a void or area of poor adhesion, causing its further growth and local heating. Eventually this internal wear broke the inner liner of rubber beneath the fabric plies, permitting air to push beneath the tread to form a bulge which ultimately ruptured, deflating the tire abruptly.

Reffner identified two operating conditions which could produce a similar failure sequence in nondefective tires: overloading and "gross" underinflation. The region where the ply cords broke is one of high stress and substantial flexing which either overloading or underinflation will augment. However, he found no sign of overloading, which he said is usually manifested by the appearance of cracks in the rubber of the tread grooves. The tread was unevenly worn, which to him did indicate some underinflated operation, but within a normal range, especially for

a tire which had had such long wear. If there had been gross underinflation, Reffner said he would expect to find signs of excessive heating and a larger area of damage.

Notwithstanding his credentials, Reffner made several statements and admissions under cross-examination that tended to cast doubt upon the thoroughness of his examination and the probative value of the physical evidence that he cited to support his opinion. He admitted that he did not know precisely how the tire was manufactured. He had not noted in his examination report and had not known when he gave his deposition the number of plies or whether they were nylon or rayon, whether the tire was belted or nonbelted or whether it was a tube or tubeless tire. Although the gas station attendant had marked the bulge on the exterior sidewall of the companion tire, Reffner missed it. He made no comparison of the two tires. He did not dismount the flat tire from the wheel to examine its interior. Asked to specify the layer of the tire where the void or area of poor adhesion had originated, he said he believed that the tread first separated from the top ply, and that the point of the incipient defect was between these two layers. He maintained this position in the face of a contradictory finding in his earlier written report that the failure originated between the two fabric plies. He changed his mind, he said, because, after viewing the photographic exhibits at the trial, "It looks as though the wear is between the tread and the fabric plies."

On direct examination Reffner said that overheating is one circumstance indicating gross underinflation and there were no signs of overheating in the tire. On cross-examination he said that overheating ordinarily accompanies the expansion of a void built into a tire at manufacture. If overheating is symptomatic of both underinflation and a defective tire, then its absence would justify the inference that neither condition was present. The other principal circumstantial support for Reffner's theory—the frayed, abraded condition of the ply cords—was also open to ambiguous interpretation. He acknowledged that at least some of the scuffing and abrasion could be attributed to the continued turning of the tire during the skid after the rubber covering the ruptured area had blown off, and he admitted that one of the findings of his written report had been that the tire had been driven on while flat. On the other hand, since it had not freed itself from the rim, he did not think it had been driven for any distance in that condition.

■■ The plaintiff sought recovery under alternative theories: that the defendants breached their implied warranty of fitness for the purpose for which the tire was purchased and that they were strictly liable in tort. To recover under the implied warranty theory it was necessary for the plaintiff to prove that she made known to the seller the purpose for

which the tire was purchased and relied upon the seller's judgment, that there was some defect in the tire when sold which rendered it unfit for the intended use, and that her injury was caused by that defect. (*Van Winkle v. Firestone Tire & Rubber Co.* (1969), 117 Ill.App.2d 324, 253 N.E.2d 588.) To recover under the strict liability in tort theory the plaintiff was obliged to show that her injury resulted from a condition of the tire, that the condition was unreasonably dangerous and that it existed at the time the tire left the manufacturers' control. (*Suvada v. White Motor Co.* (1965), 32 Ill.2d 612, 210 N.E.2d 182.) The defendants claim that the evidence offered by the plaintiff failed to establish either of the elements common to both theories: the existence of a defective condition when the product left the defendants' control or that such a condition proximately caused the blowout. Because of this identity of the elements at issue, our discussion is couched solely in terms of products liability.

Strict products liability is not a doctrine of absolute liability entitling any person harmed while using a product to recover from any member of the production and distribution group. It does not make a manufacturer, distributor, or retailer an insurer of the consumer's safety. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill.2d 418, 261 N.E.2d 305.) It is liability without negligence, but it is not liability without fault. (*Zoerner v. Eisner Grocery Co.* (1969), 111 Ill.App.2d 342, 250 N.E.2d 156.) It was the plaintiff's duty, in order to make out a prima facie case, to present evidence that the tire failed to perform in the manner reasonably to be expected in the light of its nature and intended function. In order to establish lack of fitness she could rely on direct or circumstantial evidence, such as proof which tended to exclude other, extrinsic causes, or expert opinion that the tire was defective. *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill.App.3d 165, 298 N.E. 2d 289; *Bollmeier v. Ford Motor Co.* (1970), 130 Ill.App.2d 844, 265 N.E.2d 212.

● 4   The immediate cause of injury to the Mullens was the failure of the left rear tire and it is not disputed that the failure was internal. However, it cannot legally be presumed from evidence of the mere occurrence of an accident involving a product that the product was defective when it left the manufacturer's control (*Larson v. Thomashow* (1974), 17 Ill. App.3d 208, 307 N.E.2d 707), and the existence of an unreasonably dangerous condition of manufacture cannot be inferred from the single fact of a tire blowout. *Shramek v. General Motors Corp.* (1966), 69 Ill. App.2d 72, 216 N.E.2d 244; *Van Winkle v. Firestone Tire and Rubber Co.*

It is the defendants' contention that the history of the tire's long life of safe use under a variety of conditions is so inconsistent with the

existence in it of an unreasonably dangerous manufacturing defect that it should negate the plaintiff's case as a matter of law. They point out that before its failure, the Mullen tire traveled 23,600 miles or some 16½ million revolutions, including long distance trips at highway speed; that in examining the tire the plaintiff's expert found that some tread grooves were as shallow as 1/16th of an inch and that he agreed the tread was 90 percent consumed.

■■ There is a distinction between use and wear, and a defect which causes the product to be unreasonably dangerous. (*Peterson v. Lou Bachrodt Chevrolet Co.* (1974), 17 Ill.App.3d 690, 307 N.E.2d 729, *rev'd*, 61 Ill.2d 17, 329 N.E.2d 785.) Some products are of such a nature that their useful life cannot be fixed with any certainty, but depends upon multiple, interrelated factors, including the product's purpose, construction, maintenance, and the conditions of use or abuse. (*Roseboro v. Rawlings Manufacturing Co.* (1969), 275 Cal. App. 2d 43, 79 Cal. Rtpr. 567; *Cornelius v. Bay Motors Inc.* (1971), 285 Ore. 564, 484 P.2d 299.) The longer such a product has been out of the control of the manufacturer or seller and in active use by the consumer, the greater is the likelihood that some intervening instrumentality—external force, unforeseeable misuse or lack of care in maintenance—may have caused its failure. Among the factors deemed important to a finding whether a tire was defective when it left the manufacturer's control are its relative age and wear and whether it has been regularly and recently inspected. See *Smith v. Uniroyal, Inc.* (7th Cir. 1970), 420 F.2d 438; *Barth v. B.F. Goodrich Tire Co.* (1968), 265 Cal. App. 2d 228, 71 Cal. Rptr. 306. As this court said in *Shramek v. General Motors Corp*:

> "Blowouts can be attributed to myriad causes, including not only the care with which the tires are maintained, but the conditions of the roads over which they are driven and the happenstance striking of damaging objects." 69 Ill.App.2d 72, 78.

■■■ The plaintiff in an Illinois products liability case need not plead or prove the exercise of care to discover a manufacturing defect, and it is the defendant's burden to raise the issue of assumption of risk. (*Williams v. Brown Manufacturing Co.*; *Sweeney v. Matthews* (1968), 94 Ill. App.2d 6, 236 N.E.2d 439, *aff'd*, 46 Ill.2d 64, 264 N.E.2d 170 (1970).) At the sale time, it is always the plaintiff's burden to show that a product was in a dangerously defective condition at the time it left the hands of the manufacturer or seller (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill.2d 339, 247 N.E.2d 401) and that the danger was unreasonable, that is, went beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary

knowledge common to the community as to its characteristics. Restatement (Second) of Torts § 402A, comment i (1965).

■■ The testimony of Mrs. Mullen did not dispel the likelihood that the tire's failure should be attributed to an intervening cause. Only she, or persons known to her, could show the treatment the tire received during the time it was under her control. She did not testify to habits of care or regular inspection, but rather conveyed a degree of inattention in the face of an awareness that tires have only a limited life. Of course, no negative inference follows of necessity from this testimony, since such behavior in consumers may be reasonably forseeable and whether it is should be determined by the trier of fact. But Mrs. Mullen bore the affirmative burden to produce evidence that the failure of the tire resulted from a condition present in it when it left the defendants' control some 28 months and 24,000 miles before it failed. For that purpose, her testimony was inadequate.

In view of that inadequacy her entire case depended upon the opinion of Reffner. For the reasons discussed earlier—primarily the ambiguous indicia upon which his opinion was premised and the inconsistencies between the observations and analysis in his written report and those he gave in court—the value of h's opinion was impaired. The weight of an expert opinion must be measured by the reasons given for the conclusion and the factual details marshalled to support it; it is entitled to little weight when it is inharmonious with the facts and physical evidence capable of verification by the court. (*St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.*) Nevertheless, we cannot say that, after Reffner's testimony, there was that "complete absence" of direct or circumstantial evidence which could support an inference that a defect in the product existed when it left the defendants' control. (*Larson v. Thomashow.*) We therefore find that the plaintiff's evidence was sufficient to make out a prima facie case and that the defendants' motion for a directed verdict at the conclusion of her case was correctly denied.

■■ Although we disagree with the contention of the defendants that the age and worn condition of the tire were enough by themselves to negate liability, we do agree that increased longevity must yield a progressively stronger inference that a given product—particularly a product such as an automobile tire—was not defective, but failed from extrinsic causes. In combination with the other evidence, this inference may achieve such weight that it mandates a finding in favor of the defendants. See *Arrow Transport Co. v. Fruehauf Corp.* (D.C. Ore. 1968), 289 F. Supp. 170.

Evidence to support the inference that the tire failed from an extrinsic

cause was provided by William Briscoe, the manager of tire reliability for Uniroyal and a graduate engineer, who appeared as the defendants' expert. He had 35 years' experience in tire design, construction, testing and examination. His position with Uniroyal entails examination of tires which fail and, at times, testimony at trials. It is the position of the defendants that the testimony of Briscoe overwhelmingly rebutted the plaintiff's proof of the existence of a manufacturing defect and required the direction of a verdict in their favor at the close of all the evidence.

Briscoe's testimony showed that he had thoroughly examined the tire and had discovered material physical evidence missed and unexplained by Reffner. His testimony was supported by accompanying exhibits. He found a rim cut on the left rear tire, confirming that it had been run on while flat. He dismounted the tire from its wheel to examine the interior, and found that the opening was largest in the innermost liner and decreased in dimension at each successive layer of the sidewall, so that the smallest area of damage was in the upper ply and the tread. Unlike Reffner, Briscoe noted the bulge in the sidewall of the companion tire. He dismounted it and found evidence of a similar but less advanced pattern of breakdown.

It was Briscoe's opinion that the breakdown in both tires was caused by operating them over a considerable distance—at least 200 miles— while they were underinflated by 5 to 8 pounds of air pressure. This had put a compression force on the cords of the innermost ply, twisting them and causing filaments in the cords to fray. Eventually some cords broke, tearing the tire's inner lining of rubber and putting added force on the outer ply, to begin the breakdown process anew. As the cord structure in the second ply began to break, air from the tire's inner chamber escaped, blowing off a section of tread and sidewall rubber and exposing the bare cords of the upper ply, which then were abraded to some extent during the time the car ran on the flat.

Briscoe's opinion was consistent with that of Reffner that the uneven tread wear did not show "gross" underinflation. He explained that once tire breakdown due to underinflation begins, the interior elements are so weakened that the breakdown process will continue even if the tire is thereafter returned to a condition of normal inflation. Compared to the life of the tire, the actual period of underinflation may have been of relatively short duration and would not be reflected to a great extent in the tread wear pattern. Briscoe's theory was also consistent with the frayed and abraded condition of the cords, and with the absence of evidence of heat. The tread rubber around the hole in the carcass was not shiny or smooth, and when peeled back the loose tread bore the clear imprint of the ply cords, demonstrating that internal wear had occurred in the

lower layers of the tire and not, as Reffner had believed, between the tread and the upper ply. Further confirmation lay in the fact that the innermost parts of the blowout area were more damaged than the outermost, indicating that the breakdown had begun in the lower layers and worked upward.

In addition to offering an opinion which was consistent with the observable evidence, Briscoe pointed to further errors in Reffner's theory that a void or lack of adhesion caused the blowout: Reffner's general explanation of tire construction had been incomplete and misleading; the components in a finished tire are not held together by glues, as might have been surmised from Reffner's reference to adhesives; the product is constructed from several layers of rubber-impregnated materials which, in the final stage of production, are chemically bonded together through a process of heat and pressure known as vulcanization; the layers of rubber throughout the tire are unified by vulcanization to form a single chemical bond and encase the other internal components; when the necessary degrees of heat and pressure are not applied, the bonding process will be incomplete but any resulting failure of adhesion between layers should occur in the tread, which is the thickest part of the tire and therefore the area least likely to be penetrated by the application of heat in vulcanization; the failure in the tire did not originate beneath the tread, but was high on the sidewall in an area not so thick.

Briscoe explained that a tiny void, such as a pinpoint airpocket, will never develop further, but that the symptoms of a larger void or lack of bonding will manifest themselves from the time of manufacture or not at all. A void of consequence should cause a breakdown within the first 20% of the tire's life. This is because an internal separation causes heat buildup as the layers work against one another, and any condition that causes heating will be exacerbated in the earliest life of the tire, when the tread is the thickest; although its thickness makes the tread less penetrable by external application of heat, as in vulcanization, the same characteristic means that heat, once present is retained. Also, heat from friction should be evidenced by a changed appearance of the rubber around the void, which was not the case here. Finally, Briscoe pointed to a most telling error in Reffner's opinion. Reffner's final opinion was that the void or lack of adhesion originated between the outer ply and the tread. Had that been the case, the uppermost layer of rubber would have heated and peeled away, but the cords—which Reffner himself had stated were the strength members of the tire—would remain unbroken and unimpaired, at least until they had been driven upon bare for several miles.

■■ The conflicting testimony of expert witnesses normally raises an

issue uniquely determinable by the trier of fact, who is in a better position to view the pertinent exhibits and assess the credibilty of witnesses. (*St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.*) However, our examination of the photographic exhibits and the review of the testimony of the opposing experts forces the conclusion that the only reasonable explanation for the tire's failure was the one offered by the defendants.

■■ The opinion of the plaintiff's expert was so thoroughly discredited that ultimately, only one fact remained to support the verdict: the tire's failure was internal and was not directly caused by an external force. But the finding implicit in the jury's verdict, that the internal failure occurred in this two-ply tire which had been used for 28 months and nearly 24,000 miles because it was not reasonably safe when manufactured, was against the manifest weight of the evidence and either the defendant's motion for a directed verdict after all the evidence had been heard or their motion for judgment notwithstanding the verdict should have been granted.

The judgment of the Circuit Court is reversed.

Reversed.

McGLOON, P. J., and MEJDA, concur.