MICHAEL HAMPTON, Plaintiff-Appellant, v. SEARS ROEBUCK AND COMPANY, Defendant-Appellee and Third-Party Plaintiff (L.J. Hampton, Third-Party Defendant).

First District (6th Division)   No. 1—91—3806

Opinion filed August 27, 1993.

Joseph A. Terc, of Chicago, for appellant.

Patrick M. Graber and Joshua L. Prober, both of McCullough, Campbell & Lane, of Chicago, for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Michael Hampton, appeals from a jury verdict in favor of the defendant, Sears Roebuck & Company (Sears). The plaintiff maintains that he was entitled to a directed verdict in his favor or, alternatively, that he is entitled to a new trial because the verdict was against the manifest weight of the evidence. He also maintains that he is entitled to a new trial because the judge erroneously instructed the jury.

The plaintiff was injured when he fell from a swing set, which had been constructed by his father, L.J. Hampton. He sued Sears under a claim of product liability because the coupling link, which was purchased from Sears, was sold in an allegedly unreasonably dangerous condition. The plaintiff also sued his parents, Nancy and L.J. Hampton, for negligent maintenance of their property, but the plaintiff voluntarily dismissed them before jury selection. Sears filed a third-party action against Nancy and L.J. Hampton but dismissed Nancy Hampton during the subsequent trial.

In his complaint, the plaintiff stated that the links which were purchased from Sears were "repair links for temporary chain repair and coupling of attachments." He further alleged that the repair link became "straightened and disconnected from the eyebolt it was attached to" and that the link was "unreasonably dangerous in that it failed to perform in the manner in which it was intended and that it failed to have adequate warnings concerning its use."

Nancy Hampton, the plaintiff's mother, testified that her husband, who was very good at carpentry, designed and constructed a swing set in the summer of 1983. She and her husband looked at various stores for materials. At Sears, where they had a charge card, they talked to an older woman who assisted them in choosing a chain for the swings and eyebolts to secure the chains to the support beam. The older woman also assisted them in choosing how to attach the chains to the eyebolts. The woman showed them one package of repair links and then another package to support heavier weight. The woman said to attach the links with a pair of pliers. Nancy Hampton paid for the purchases on a Sears charge card, but she could not produce the sales receipt.

On September 2, 1984, Nancy witnessed her son Michael fall from the swing set. He was not swinging high, and he "just like went straight out." After the accident, she inspected the swing set and noticed that the top link was missing. She found the link and placed it in a drawer with the other links, still in the original package, that were purchased the year before. The used link and original package with four unused links were admitted into evidence. The package contains the following language:

"3/16 X 1 in. Repair Links

For temporary chain repair and coupling of attachments.

Working load limit 240 pounds."

L.J. Hampton testified that it took about two months to construct the swing set. He used cedar logs to construct the frame and used long bolts to attach the logs together. Before going to Sears for materials, he looked at K mart, Venture, and other stores that carried chains. The weight of chains available at those stores was insufficient. At the Sears store in Orland Park he found a chain of appropriate weight.

He spoke to a saleslady about hooking the chain to the eye bolt. He testified:

"That's where *** she assisted me with coming up with the idea of using these, I call them split links. *** I think we're referring to them as clips. *** [S]he brought them out and suggested that this could be used."

The saleslady showed him two different types of clips, and he selected the heavier type for greater support. He told the saleslady of his intended use for the chains, the eyebolts, and the clips. He testified that the saleslady told him about the use of the clips, that the clip was "easily hooked together and then all it needed was a pair of pliers to squeeze it together." She never told him to use the repair links

on a temporary basis. While installing the links, he did not note any defects. Before the accident, none of the other clips was broken or had to be replaced. He himself also used the swing on occasion; he weighed 195 pounds at the time of the accident. His three other children, his grandchildren and some neighbors' children used the swing also.

On cross-examination he testified that the saleslady did not give him any instructions on how to use the repair links. The conversation involved what to use, not how to specifically use the links. He did not recall reading the instructions on the package, but did remember the weight restriction. He used pliers to close the repair links when installing them. All of the links were shiny when purchased, and none appeared rusted in any way. He did not ask the saleslady whether the links should have been changed after the winter nor did he ever use repair links before this incident. He did not take the swing set down before the winter nor did he protect it from the elements. He did not inspect the links for wear or rust.

Pictures of the swing were also introduced. They showed that there were two swings. Each swing used four clips. Two at the top connected the chain to an eyebolt and two connected those parts of the chain supporting the seat.

The plaintiff, who weighed 150 pounds at the time of the accident, testified that he was swinging "leisurely" at the time of the accident and just flew out of the chair and hit the ground. He suffered a fractured ankle. He admitted that the chain was rusted in some parts. After he testified, the plaintiff rested, and the judge denied Sears' motion for a directed verdict.

Lillian Maduzia worked in the Sears hardware department in 1983. She testified that she never told a customer that a repair link would be appropriate for use with a swing set.

Patricia Ann Kolb, another saleslady employed in the Sears hardware department in 1983, testified that if anyone asked her about swing sets in the hardware department, she would send them to the sporting goods department because, she said, "We don't sell swings and we don't know what to do with swings." She never told a customer to use repair links for a swing. She said that Barbara Malarik, a former clerk in the hardware department, no longer worked for Sears and that she was in Florida on vacation during the trial.[1]

[1]The names of Malarik, Kolb and Maduzia were given to the plaintiff in answers to interrogatories. The plaintiff never deposed any of them, and the plaintiff never sought to subpoena any of them.

John Streit, the buyer for playground equipment at Sears, testified that Sears sold a reconditioning kit for swing sets in 1983. The kit contained the most common parts that would wear out, such as replacement chains, replacement plastic seats, a bearing attachment for attaching the chains to the head bar, and bolt tip covers that cover the exposed ends of a bolt on a set. The chain is attached to the bearing, which has a nut and bolt that affix to the head bar. This item had been for sale at least 20 years and was available in the toy department. The kits were made for the metal swing sets sold by Sears but could be used with a wooden beam if the bolts were long enough. The weight limit was 75 pounds.

Nancy Hampton testified in rebuttal that neither of the two salesladies that testified for Sears helped her in 1983 nor did anyone direct her to the sporting goods department.

The plaintiff contends that the trial judge erroneously denied his motion for a directed verdict. He argues that the evidence establishes, as a matter of law, that the repair link failed to perform in the manner it was intended and that this failure was the proximate cause of the injury.

A plaintiff is entitled to a directed verdict or a judgment notwithstanding the verdict when all the evidence, viewed in its aspect most favorable to the defendant, so overwhelmingly favors the plaintiff that no contrary verdict based on that evidence could ever stand. In passing on the propriety of a directed verdict for a plaintiff, courts of review must consider the defendant's evidence in its most favorable light, together with all inferences in the defendant's favor which may be legitimately drawn from the evidence. *Szarat v. City of Chicago* (1983), 117 Ill. App. 3d 809, 454 N.E.2d 68.

To recover under strict liability in tort, a plaintiff is obliged to show that his injury was proximately caused by a defective product and that the defect existed at the time it left the defendant's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) Products are defective which are dangerous because they failed to perform in the manner reasonably to be expected in light of their nature and intended function. (*Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 357 N.E.2d 449.) Like any fact, the defective nature of a product may be proved by circumstantial evidence. But a fact is not established from circumstantial evidence unless the circumstances or events are so related to each other as to make that conclusion the only probable, not possible, one that can be drawn from them. (*Schmitt v. Mertel* (1991), 208 Ill. App. 3d 741, 567 N.E.2d 594.) The mere occurrence of an accident involving a product does not

give rise to a presumption that the product was defective when it left the manufacturer's control. *Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 336 N.E.2d 338.

■ The heart of the plaintiff's argument is his contention that "the jury cannot refuse to accept the unrebutted evidence that was submitted to them." He refers specifically to the testimony of Nancy and L.J. Hampton of their conversation with an unidentified saleslady at Sears. We confess to having some difficulty in determining the significance of the testimony. The claim is that the product was defective at the time Sears sold it to the plaintiff's parents. There is no claim of negligent representation by an agent of Sears nor of a breach of an express warranty. The relevance of the testimony was explained by the plaintiff's lawyer at the argument on Sears' motion for a directed verdict:

> "I would point out to the Court that the evidence was rather obvious that discussions concerning the salesclerk was [*sic*] only to show that Sears was aware of the purpose for which [the clip] was to be used. That they acquiesced in that purpose; and, in fact, they are the one who supplied or suggested the clips to be used for that purpose, all of which goes towards a products' liability case."

It is apparent, therefore, even if we accept the plaintiff's claim of the relevance of the testimony, that the alleged conversation between Nancy and L.J. Hampton and the unidentified saleslady is crucial to the plaintiff's position. It necessarily follows that so also is his claim that the testimony of Nancy and L.J. Hampton of the alleged conversation between them and a saleslady must be accepted as a matter of law.

In support of his position, the plaintiff refers to the language of *Drake v. Harrison* (1987), 151 Ill. App. 3d 1082, 1086, 503 N.E.2d 1072:

> "Where the testimony of a witness is neither contradicted by testimony or circumstances, nor inherently improbable, and the witness has not been impeached, that testimony may not be disregarded even by a jury."

It is also true, however, that a fact finder may disregard testimony which is discredited by circumstances. (*Lasky v. Smith* (1950), 407 Ill. 97, 94 N.E.2d 898.) We judge that the "circumstances" disclosed by the plaintiff's own evidence and the defendant's evidence cast sufficient doubt on the testimony of Nancy and L.J. Hampton that a fact finder would be justified in rejecting it. To begin, the plaintiff's parents obviously had an interest in the case; in fact, both were

originally named as defendants, and L.J. Hampton remained a defendant under Sears' contribution claim. L.J. Hampton had more than superficial experience as a carpenter. He had previously built a bookcase, some benches and a table. Working with wood had been his hobby for years. He personally designed the set; he personally selected the wood to be used and the eyebolts; he personally went to a number of hardware stores because he was dissatisfied with the strength of the chains available at the other stores. He personally selected the chain that was used; and he personally selected the clips in preference to another weaker set of clips that was available. In addition, two of the only three persons who could have dealt with L.H. Hampton denied advising him how to use the clips. It would not be unreasonable for a fact finder to conclude that the third missing witness would have said the same thing.

Under all these circumstances, a fact finder would be justified in concluding that the plaintiff's father, an experienced carpenter, would not defer to the judgment of an unknown saleslady and that the conversation to which the plaintiff's father and mother testified did not occur. In any event, even if the testimony of the conversation was accepted, the saleslady never told the plaintiff's father that the clips could be used as a permanent attachment, contrary to the express language of the package that the clips were "temporary."

The plaintiff's case is concededly based on circumstantial evidence. As we previously noted, a fact is not established from circumstantial evidence unless circumstances or events are so related to each other as to make that conclusion the only probable, not possible, one that can be drawn from them. (*Schmitt v. Mertel* (1991), 208 Ill. App. 3d 741, 567 N.E.2d 594.) The plaintiff's circumstantial evidence must prove that it is more probably true than not true that his injury was caused by a defect in the product and not by some misuse of the product or other secondary cause.

We have examined the unused clips. One does not have to be an engineering expert or need not receive expert testimony to recognize that squeezing two pieces of metal together with pliers is a makeshift arrangement when one sees that the clips would be expected to carry 240 pounds. Even to our untrained eyes, the possibility is obvious that the parts squeezed together might not remain together after protracted use, particularly if the clips were used as swivels and subject to repeated friction. Our examination of the allegedly defective clip discloses that parts of the clip have been partially worn away by friction and that the ends are detached from each other, leaving a gap larger than a quarter of an inch. A fact finder could conclude that the

clip worked itself apart because the ends had not been properly squeezed together.

The plaintiff maintains that there is no reasonable explanation why the other seven clips did not also break. We do not believe that the plaintiff may compare the clip in issue with the four clips supporting the seats. They were not subject to the same wear as the clips attached to the eyebolts. Moreover, there is no testimony as to the condition of the remaining three clips still attached to the eyebolts other than the fact that they are still there. We are unable to determine from the pictures whether they show any evidence of wear.

In *Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 130, 336 N.E.2d 338, 344, the court explained the distinction between use and wear and a defect which causes a product to be reasonably dangerous:

"Some products are of such a nature that their useful life cannot be fixed with any certainty, but depends upon multiple, interrelated factors, including the product's purpose, construction, maintenance, and the conditions of use or abuse. [Citations.] The longer such a product has been out of the control of the manufacturer or seller and in active use by the consumer, the greater is the likelihood that some intervening instrumentality—external force, unforeseeable misuse or lack of care and maintenance—may have caused its failure."

We conclude that the plaintiff has failed to establish that, as a matter of law, the clip sold by Sears was defective at the time that Sears sold it and that the failure of the clip may not have been caused by some intervening instrumentality.

■■ The plaintiff alternatively argues that the jury verdict was against the manifest weight of the evidence. For the same reasons that we determined the judge properly denied the plaintiff's motion for a directed verdict, we determine that the verdict is not against the manifest weight of the evidence. In his argument that the verdict was against the manifest weight of the evidence, the plaintiff also claims that the clips were defective because they lacked proper warnings. He says, "If the clips had limited use or that you should be restricted in some way, it was up to Sears to give an adequate warning." He cites no cases in support of his argument, and he does not tell us what an adequate warning would have been. The plaintiff's father was placed on notice that the clips were "temporary." The proof was that he intended to make the clips permanent. We cannot say that the plaintiff has established by the manifest weight of the evidence that any failure to warn proximately caused his injury.

■ The plaintiff next maintains that the court committed reversible error in the giving of instructions and the refusal of instructions. He contends that the judge erred in the following rulings:

(1) he instructed the jury that Sears could obtain contribution from L.J. Hampton for willful and wanton negligence;

(2) he refused to instruct the jury that Sears had a nondelegable duty to furnish a product that was reasonably safe and instructed the jury on the issue of sole proximate cause; and

(3) he refused to instruct the jury on the effect of a failure to produce a witness.

Sears contends that the plaintiff has waived any assignment of error in the giving of instructions because of the inadequacy of the plaintiff's post-trial motion. In the post-trial motion, the plaintiff alleged that the judge erred in giving Sears instructions numbers 7, 9 and 10; in refusing to give plaintiff's instructions numbers 9 and 16; and in giving both plaintiff's instruction number 10 and Sears' instruction number 7. The instructions were set out in the motion verbatim. The motion did not specify the grounds upon which the allegations of error in the giving or refusal of instructions were based.

We are compelled by *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337, a case cited by Sears, to hold that the plaintiff's post-trial motion was not sufficiently specific to preserve for review the question of the sufficiency of the instructions.

In *Brown*, the post-trial motion alleged that "The court refused to give Plaintiff's tendered instructions 9, 11, and 16" and that "The Court gave, over objection of the Plaintiff, Defendant's tendered instructions 2, 3, and 4." (*Brown*, 83 Ill. 2d at 349.) The supreme court held that because neither of the allegations of error specified the ground upon which it was based, they were clearly inadequate under section 68.1(2) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 68.1(2)) (now Ill. Rev. Stat. 1991, ch. 110, par. 2—1202(b)) and Supreme Court Rule 366 (73 Ill. 2d R. 366(b)(2)(iii)).

The supreme court explained that the purpose of requiring specificity in a post-trial motion is threefold: (1) to allow the trial judge to review his decisions without the pressure of an ongoing trial and to grant a new trial if, on reconsideration, he concludes that his earlier decision was incorrect; (2) to allow a reviewing court to ascertain from the record whether the trial judge has been afforded an adequate opportunity to reassess the allegedly erroneous ruling; and (3) to prevent the litigants from stating mere general objections and subsequently raising on appeal arguments which the trial judge was never given an opportunity to consider. The court also stated the bare

requirements of a sufficient post-trial motion: "All that is necessary is a simple, succinct statement of the factual or legal basis for [the] movant's belief that the trial court action was erroneous." (*Brown*, 83 Ill. 2d at 350.) The supreme court noted that, when reviewing a post-trial motion, a trial judge does not have the benefit of the jury instruction conference transcript, and he is forced to rely upon his recollection of arguments that were made weeks or months before.

*Brown* is clearly in point in this case, and we are bound to follow it. We, therefore, conclude that the plaintiff has not preserved for review the question of any error in the giving or refusing of instructions.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and GIANNIS, J., concur.