EDITH HEPLER, Plaintiff-Appellee, *v.* FORD MOTOR COMPANY *et al.*, Defendant-Appellant.

(No. 72-250;

Fifth District—April 18, 1975.

Mitchell & Armstrong, Ltd., of Marion, for appellant.

Harris and Lambert, of Marion, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

Appellee, Edith Hepler, brought an action for personal injuries against Ford Motor Company and Vogler Motor Company, Inc. Her complaint charged the defendants jointly with liability based upon strict liability in tort and breach of implied warranties of fitness of use and merchantibility with reference to a Ford Falcon automobile designed, manufactured and sold by defendants. Appellee was injured in a one-car accident while operating the Ford Falcon. The jury returned a verdict in favor of appellee and against Ford Motor Company (under the theories of strict liability and breach of warranty) for the sum of $6,250.00. The jury also returned a verdict in favor of Vogler Motor Company, Inc., and against appellee (under each theory). Appellant Ford Motor Company filed a post-trial motion, seeking judgment notwithstanding the verdict, or in the alternative, a new trial. The trial court denied appellant's post-trial motion in its entirety. Appellant Ford Motor Company now brings this appeal from the judgment entered against it by the trial court in accordance with the jury's verdict, and from the trial court's order denying the appellant's post-trial motion.

As a prologue to our opinion, we note that appellee did not file a cross-appeal from the verdict and judgment in favor of Vogler Motor Company, Inc., nor is there before us the question of indemnity between the dealer (Vogler Motor) and the manufacturer (Ford.) The basic issues before us, as raised by appellant Ford Motor Company, focus on the following:

1) whether the evidence was insufficient as a matter of law to support the jury's verdict against Ford Motor Company;

2) whether a new trial should be granted because:

a) the verdict against appellant Ford Motor Company was *inconsistent* with the verdict in favor of the co-defendant dealer, Vogler Motor Company, Inc.;

b) the trial court admitted certain of appellee's exhibits (photographs) and permitted the testimony of appellee's expert John Essick, over appellant's objections.

In view of our determination in this case, we need not discuss the specific issues raised with regard to a new trial, except as they bear upon the fundamental issue in this case: whether the evidence was insufficient as a matter of law to support the jury's verdict against appellant Ford Motor Company and, whether, therefore the trial court should have granted appellant Ford Motor Company's motion for judgment *n.o.v.*

■■  The standard of review which we apply in this case was announced in *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513-514, in which the Illinois Supreme Court stated:

"In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so *overwhelmingly* favors movant that no contrary verdict based on that evidence could ever stand." (Emphasis added.)

Accordingly, in the instant case, we review all of the evidence, in its aspect most favorable to appellee, to determine whether such evidence *so overwhelmingly* favors Ford Motor Company that no verdict based on such evidence (except for appellant Ford Motor Company) could ever stand.

It is well to keep in mind while reviewing the evidence that appellee alleged, and sought to prove, that she was injured as the result of operating the 1968 Ford Falcon automobile, which, as designed, manufactured and sold, was defective and unreasonably dangerous so that its *braking mechanism failed to function properly.*

The evidence shows that Len Spires, Carbondale, Illinois, of Spires Institutional Grocers, on February 1, 1968, purchased from Vogler Motor Company, Inc., Ford dealer, a new 1968 Ford Falcon four-door sedan. Prior to February 13, 1968, the date appellee sustained injury, Mr. Spires gave the Ford Falcon to appellee for her use as a traveling saleslady for Spires Institutional Wholesale Grocers. The vehicle was in the same condition when Mr. Spires gave it to appellee as it was when he purchased it. The Ford Falcon had operated to Mr. Spires' satisfaction and without difficulty.

On February 13, 1968, appellee was operating the Ford Falcon as a saleslady for her employer, and the vehicle had less than 1,000 miles of travel by that date. No changes had been made in the vehicle, and prior to the accident, the vehicle was operating properly. Appellee had noticed nothing unusual about the Ford Falcon, including its brakes.

At about 4:30 to 5 P.M. on February 13, 1968, appellee was on her way home to Johnston City, Illinois, having made a call to the Ramada Inn in Marion, Illinois. She was driving the Ford Falcon in a northerly direction on Illinois Route 37, which is a two-lane road. At or near the Village of Dogwalk, Illinois, a car passed appellee, and appellee remained behind this car until the accident happened. The road was straight and level, and the weather was clear. When appellee was at a point near the south entrance of the Rolling View Tavern the car in front of her made a right-hand turn. Appellee was then 2 or 2½ car lengths behind this car, traveling at approximately 30 or 40 miles per hour. There was nothing to keep appellee from turning the Ford Falcon to the left and going on around the car ahead. Appellee could see ahead, and the opposite lane of highway coming toward her was clear at the

time. She was not too close to the other car, but she automatically put on the brake. The brakes were not applied hard, as appellee testified that she "touched" the brakes. The wheels did not lock. The steering wheel did not lock when the brakes were applied. Appellee made no effort to turn the car to the left or right, gently or otherwise, when she applied the brakes. She did not "jerk" the Ford Falcon. Appellee testified that the Ford Falcon brakes did not hold at this time, and she further testified that she did not know what then happened; she just held on to the steering wheel. She did not know what was wrong with the vehicle. The Ford Falcon veered to the left, crossed the opposite lane, sliding across the pavement to the left shoulder, and turned upside down with all four wheels in the air.

Appellee testified that there never had been any grabbing of the brakes at any time before the accident. There was never any vibration or banging sound before the accident. There never was a problem with the steering. There was a red light on the dashboard of the Ford Falcon, which would light up if the brakes were not working properly. Prior to the accident the appellee never saw such red light go on.

Appellee's witnesses, Ronald Swafford and Larry Farner, both wrecker drivers who were at the scene of the accident, testified, over the objection of appellant, that they had viewed the Ford Falcon at the scene of the accident, while the vehicle was resting on its top. Both testified that they saw a brake line wrapped around the drive shaft of the vehicle. Both testified that certain of appellee's exhibits (photographs), correctly portrayed the underneath side of the Ford Falcon as they had seen it on the date of the occurrence.

Over the objection of appellant, appellee called Paul Calhoun, pursuant to section 60 of the Civil Practice Act. Mr. Calhoun, who worked for Vogler Motor Company, testified that the Ford Falcon was brought to Vogler Motor Company, about a day or two after the accident occurred. He examined the vehicle at that time and found that the brake-fluid line was wrapped around the vehicle's drive shaft two or three times. The brake line that was broken carried brake fluid to the rear wheels. He testified that the rear-wheel brakes would not function with the back brake-fluid line broken, but notwithstanding the broken back brake-fluid line, there still would have been brakes to the front wheels— in other words, the broken brake-fluid line wrapped around the drive shaft at the universal joint would have rendered inoperative the brakes to the back or rear wheels, but not the brakes to the front wheels.

Further, Mr. Calhoun testified that the brake line on a Ford Falcon automobile goes along the underneath side of the car in the well where the drive shaft is located. It is fastened to the floor board of the car

with clamping screws, and is 3 or 4 inches from the drive shaft. The underneath side of the car is metal. Mr. Calhoun testified that when he examined the Ford vehicle, there was no brake pedal action with respect to the vehicle, but this was because the vehicle had been turned upside down, thereby permitting all of the brake fluid in the cylinder to reverse itself and to go to the bottom of the cylinder. This condition caused air space between the piston and the brake fluid so that the brake pedal, if pushed downward, would go all the way to the floor board. Such condition would effect a still good brake line to the front wheels.

Appellee's expert witness was John Essick, operator of a brake shop. Mr. Essick had been in the business of overhauling and doing brake work for 40 years. Apparently, Mr. Essick did not examine the underneath side of the vehicle immediately after the occurrence and before the vehicle was repaired. He apparently did look at the vehicle just prior to the trial.

Over the objection of the appellant, Mr. Essick examined appellee's photographs depicting the underneath side of the vehicle and the break in the back brake-fluid line. Mr. Essick identified the photographs as depicting the brake line wrapped around the drive shaft and stated that the photographs showed that the brake line was looped around one of the universal joints which had caused the line to wrap itself around the drive shaft. Mr. Essick was of the opinion that the car was moving in a forward direction when the line wrapped around the shaft.

Over the objection of the appellant, Mr. Essick testified that in his opinion, the brake malfunction happened just before the appellee applied the brakes, or at the immediate time she applied the brakes. But he also testified further that it would be almost utterly impossible for the drive shaft to move over to catch the brake-fluid line to cause it to break, because under normal driving conditions there is very negligible side-to-side motion of the drive shaft, at most an inch, and the brake line is 2½ inches from the universal joint. On cross-examination, Mr. Essick testified that he saw nothing defective about the clip or bolt that held the brake line to the bottom of the vehicle, and that whatever had caused the bolt to sheer away and the brake line to break or the clip to do so had to occur after it left the possession of Vogler Motor Company. The brake line would have had to become disconnected from the holding clip in order to come into contact with the drive shaft.

Most important is Mr. Essick's testimony with regard to the cause, if any, of the Ford Falcon changing directions at the time when appellee applied the brake. Mr. Essick was asked:

"Q.:  *  *  *  Under the circumstances that you heard testified here by Mrs. Hepler, assuming she was driving along about

35 to 40 miles per hour, the brake line snaps like that, the instant the brakes applied, is there any reason for the automobile to move left or right, assuming it is going straight ahead?"

In response to that question, Mr. Essick stated: "No, Sir, I don't know of any reason why, just the brake line going out." When asked if his opinion would be changed in regard to the matter if circumstances were changed from that to which the appellee had testified with regard to her speed and closeness to the automobile in front of her, Mr. Essick testified: "I don't think it would, I don't see what different conditions would have to do with it."

Having examined the appellee's photographic exhibits (which depicted the brake line wrapped around the universal joint of the drive shaft of the Falcon automobile approximately two or three times), Mr. Essick responded to the following series of questions as follows:

"Q.: Did it do what I said?
A.: The line broke.
Q.: Alright.
Q.: Alright, now where did it break, front or back?
A.: In front.
Q.: Alright, show it, mark it (indicating to the witness Appellee's Exhibits 1, 3, and 6).
A.: Now you can't see it on these pictures. It isn't far enough off.
Q.: Well, how do you know it broke in front then?
A.: All I can do is on the assumption, sir. I haven't seen the car.
Q.: Then you do not know where the line broke?
A.: The only thing I can do is go on assumption.
Q.: Do you know where the line broke?
A.: Not positively, no."

Appellee's expert witness, Essick, testified that in his opinion the clip and bolt shown in one of appellee's photographic exhibits had come apart as a result of sheering or pulling stress. This sheering and stress had to occur when some other condition occurred other than normal operation. Mr. Essick had no opinion on how large the brake-line break was. It could have resulted as a result of some flying rock or other normal conditions to be expected in driving automobiles, one of the circumstances that occurs after a car is designed, manufactured and sold. Further Mr. Essick gave the following opinion:

"Q.: So isn't it just as logical, according to your opinion about how this happened, that if there were some small hole or break in this line it occurred as a result of that [normal driving conditions] as it is that it occurred as a result of manufacture?

A.: Yes, sir.

Q.: Alright, sir, and you can't express an opinion to this jury either way which it was, can you?

A.: No, I can't."

Appellant's witness, Judy Davis, was the driver of the car which was immediately in front of appellee just prior to the accident. She testified that appellee's automobile was traveling very close behind her, at approximately 10 feet, and at about a speed of 30 to 40 miles per hour. She further testified that she had passed the driveway where she intended to turn and went on north to another driveway because of the closeness of appellee's car. She stated that when she looked in the rear view mirror, she saw appellee's Ford Falcon upside down on its top sliding down the highway and across to the west side where it came to a stop against an embankment.

Immediately after the occurrence, Judy Davis had a conversation with the appellee, and she had told her (Judy Davis) that she did not see any signal and did not know why she had not driven the Ford Falcon around Miss Davis' car since there was no traffic. Further, Miss Davis testified that appellee had told her that she (appellee) had put on her brakes and didn't know what had happened after that.

Appellant's expert witness was Robert Ridings, a Ford Motor Company product quality-control engineer. His 15-year experience in a laboratory as a manufacturing testing engineer had included testing vehicles, taking them down, assembling them and putting them back together, and such work included braking systems. Mr. Ridings identified the dual master cylinder system of the 1968 Ford brake system, and stated that the 1968 Ford Falcon being driven by the appellee at the time of the occurrence was designed for the brakes to have greater force and weight on the front rather than the rear. He stated the front-wheel brakes do more work than the rear-wheel brakes, and that the Ford braking system was designed to have separate braking lines to the front two wheels and the back rear wheels. There were two master cylinders that handled hydraulic fluid for these brakes, and the brakes were designed so that a red light would come on the dashboard to warn the driver if there was a failure either on the front or rear brakes. In the event of a failure of either the front or rear braking mechanism, there would still be braking action on the wheels that have not failed. The hydraulic lines run underneath the car and are fixed in a well where the drive shaft is located and clamped up against the steel bottom of the car, known as a tunnel. The lines are fixed up underneath the curved tunnel because this is the position of maximum protection.

Having reviewed the appellee's photographic exhibits, Mr. Ridings

testified that the photographs showed a portion of the rear brake line wrapped around the drive shaft two or three times, and that in his opinion, based on the statements of the appellee, that she was driving the Ford Falcon at approximately 35 to 40 miles per hour, this would mean that the drive shaft on the automobile would be circulating or revolving at approximately 3,000 revolutions per minute (50 revolutions per second). In Mr. Ridings' opinion, the brake line could not have broken at any time immediately prior to or at the time appellee had applied her brake because the brake-fluid line then would have been badly wrapped up and it would have been severed at the front end. Mr. Ridings further testified:

> "[Mr. Ridings]: It is my opinion that the tube [brake fluid line] came in contact with the drive shaft during the course of the accident. Either through the gyration the car went through or dislodgment of this engine or the motor mount. It could have occurred when the front of the vehicle went into the bank.
>
> Q.: Must it have occurred, in your opinion, after the car had left the pavement?
>
> A.: Yes, sir."

Mr. Ridings also testified that he had examined the 1968 Ford Falcon on November 17, 1971, and on the day of the commencement of the trial. He stated that there was a dent in the floor board of the car right adjacent to the drive shaft, and he could see where the brake line had been repaired as witness Calhoun had identified. Mr. Ridings could identify the portion of the rear-line tubing that existed in front of where the repair work was done. He stated that when the Ford Motor Company assembles brake tubing it cannot do so in one piece all the way from the master cylinder underneath the car to the rear axle, and therefore it makes a separation in the line. This juncture is about 15 inches in front of the universal joint. After the vehicle had been repaired, Mr. Ridings had examined the vehicle and he could see where the portion of the brake line repaired by Mr. Calhoun had commenced. It had been replaced approximately at the point of the universal joint to the rear of the vehicle. That portion of the brake line from the universal joint forward was the one that was put there at the time of the manufacture by the appellant, Ford Motor Company. There was no change in the line, no defect, hole or any other thing in the line to indicate that it was not worthy of use. In further explanation of this matter, Mr. Ridings responded as follows:

> "Q.: So that with reference to Mr. Essick's testimony in which he said assumed the line must have broken in the front of that universal joint, did you hear him say that?

A.: Yes.

Q.: From your examination of the line, could that have occurred?

A.: No, sir.

Q.: Why?

A.: Because it's all our line from the universal joint toward the engine compartment.

Q.: What do you mean, all your line?

A.: It is the line that was installed by the Ford Motor Company.

Q.: And is it still being used?

A.: And is still being used.

Q.: As Mrs. Hepler drives that car as she has the last three years, using the brakes she has, she has used the same line that was there before from the universal joint forward, is that correct?

A.: That is correct."

Mr. Ridings testified that the floorboard of the vehicle had been bent upwards, from something flung up against it and hitting it solid, bending the middle in. Normal operations would not cause the drive shaft to go up that distance. Considering the impact which the vehicle had when it hit the embankment as described, the engine and everything else was allowed to move, and in this case, it would pick up the brake tube and tear it and would also have torn out the clamp. Mr. Ridings testified that from examining the appellee's photographic exhibits and the appellant's exhibits, there was no indication of a brake-line failure at the time appellee had applied the brakes. There could not have been any such impact forced at that time to have caused the drive shaft to move forward as described. Specifically with regard to the movement of the vehicle to the left upon application by the appellee of the brakes, Mr. Ridings testified:

"Q.: Assume that from the evidence as Mrs. Hepler has told that she was driving down the road and applied the brakes and thereafter something happened and there are no other abnormal circumstances that have been adjudicated here or introduced except assuming the fact that the brake line may have been broken, who was it or could have caused the vehicle to have turned?

A.: It would have to be turned by the operator."

■■ In reviewing all of the evidence under the rule of review announced in *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, we turn first to the question of whether evidence is insufficient as a matter of law to support the jury's verdict under a theory of strict liability in tort. As so often has been restated by Illinois appellate courts since *Suvada v. White Motor Co.*, 32 Ill. 612, 210 N.E.2d

182, under the doctrine of strict liability the essential elements which a plaintiff must allege and prove in order to establish a prima facie strict liability product's case are: first, that the injury in question was *proximately* caused by a condition of the product; secondly, that the condition was an unreasonably dangerous one; and lastly, that the condition existed at the time the product left the defendant's control. *Belleville National Savings Bank v. General Motors Corp.*, 20 Ill.App.3d 707, 313 N.E.2d 631.

After reviewing all of the evidence in this case in light of the *Suvada* doctrine, we believe that when viewed in its aspect most favorable to appellee, all of the evidence in this case so overwhelmingly favors appellant Ford Motor Company that the verdict against Ford Motor Company should never stand.

■■ Often there is confusion between the "defective condition" of the product and the question of causation. The burden is on the plaintiff in a strict liability case, not only to prove that there was a defective condition of the product (in other words, a condition which rendered the product unreasonably dangerous), but also the plaintiff must prove that such defective condition *proximately* caused the injuries complained of. We believe from a review of all the evidence, that the appellee did not establish with credible evidence the defective condition (defective brake mechanism), and, assuming, *arguendo*, that such defective condition was proven, nevertheless appellee wholly failed to produced credible evidence showing that such defective condition was the proximate cause of her injuries.

In *Belleville National Savings Bank v. General Motors Corp.*, 20 Ill.App.3d 707, 709, 313 N.E.2d 631, 633, we noted:

> "* * * the requirement that the plaintiff establish the precise cause of his injury may, at times, be excused in an action grounded on strict liability and tort *provided the plaintiff establishes some credible basis for the reasonable inference that a condition of the product proximately caused the injury* * * *." (Emphasis added.)

■■ We also stated in *Bollmeier v. Ford Motor Company*, 130 Ill.App.2d 844, 851, 265 N.E.2d 212, that:

> "Therefore, direct or circumstantial evidence which tends to prove that the product failed to perform in the manner reasonably to be expected in the light of its nature and intended function, such as proof of a malfunction which tends to exclude other extrinsic causes, is sufficient * * *."

To support her allegation that the brake-line mechanism was defective, appellee, over the objection of appellant successfully introduced three

photographs illustrating the brake-line rupture of the 1968 Ford Falcon. Appellee's expert, John Essick, was of the opinion that a rupture in the brake line occurred prior to or at the time appellee applied her brakes. Yet on cross-examination, Mr. Essick was questioned about what evidence formed the basis of his opinion, and he stated quite clearly that appellee's three photographs did not display the rupture in the brake line to which he had referred. Moreover, he stated that he did not positively know where the brake line broke.

On the other hand, appellant's expert, Mr. Ridings, testified that the brake-line rupture shown in the appellee's photographs had to occur *after* the time the appellee applied her brakes. Several factors led to this conclusion: the brake line was wrapped around the universal joint only two or three times; the clip and bolt which attached the brake line to the bottom side of the vehicle body were sheered and torn loose as if by great stress; in distinction to appellee's expert Essick's testimony that he assumed the brake line was broken toward the front of the vehicle, appellant's expert Mr. Ridings testified that he had examined the appellee's vehicle after it had been repaired, and could see that the portion of the brake line repaired was to the rear of the universal joint. The brake line forward of the universal joint was in the same condition and was the same brake line, as had existed at the time of manufacture by the appellant, and there was no change in the line to indicate that it was not worthy of use.

Appellee's evidence with regard to the defective condition is highly equivocal. The appellee testified that she attempted to brake, but the brakes didn't hold. Appellee's expert did not examine the underside of the vehicle, but did not base his opinion on photographs introduced by appellee, but merely went "on the assumption," which was based primarily, if not entirely, upon the in-court testimony of the appellee. In striking contrast, appellant's evidence gives several possible intrinsic causes for the rupture in the brake line. Moreover, appellant's evidence, uncontradicted by the appellee, shows that the brake-fluid line in the area which appellee's witness assumed had been broken, was not in fact broken. After reviewing all of the evidence with regard to the alleged defect, we find that such evidence overwhelmingly favors the appellant. Assuming *arguendo* that there was sufficient showing of a defective condition, we are nevertheless of the opinion that the appellee wholly failed to show that such defective condition was the proximate cause of her injuries. Appellee's evidence on this point is not merely "highly equivocal"—it is virtually nonexistent.

■■ The *Suvada* case did not announce a rule of law that plaintiffs could recover against manufacturers merely on a showing, by direct evidence

or circumstantial evidence, that there was a defective condition of the product. Indeed, strict liability in tort is not carte blanche for plaintiffs to sue manufacturers—it is not an open invitation to recover damages just because a product is shown to be defective. Always the plaintiff must show that the defective condition itself was the proximate cause of the injury. In terms of causation, the evidentiary requirements to prove cause in fact in a strict liability case do not differ from the evidentiary requirements to prove cause in fact in a negligence case.

Appellee testified that when she "touched" the brake pedal (1) the wheels did not lock; (2) the steering did not lock; (3) she made no effort to turn the car to the right or left, gently or otherwise; (4) she did not jerk the car; *and* (5) she did not know what happened, but the car turned to the left and she held onto the steering wheel. It would appear from the testimony of appellee, Mr. Essick, Mr. Calhoun and Mr. Ridings that some other factor besides a broken brake-fluid line would have been necessary to cause the car to veer suddenly to the left and turn upside down. Such other factors would include the action of the operator herself. Assuming that there was a defective condition, we can find no causal relationship between the defective condition, and the injuries sustained by the appellee. It is our view that appellee did not introduce any evidence from which might reasonably be inferred that a condition of the product proximately caused the injuries. See *Belleville National Savings Bank v. General Motors Corp.*

What we have said with regard to all of the evidence under the theory of strict liability and tort, would apply to appellee's theory founded upon breach of implied warranties of fitness and merchantibility. *Bollmeier v. Ford Motor Co.*, 130 Ill.App.2d 844, 265 N.E.2d 212.

We believe it may be fairly said that all of the evidence, viewed most fairly to the appellee, so overwhelmingly favors the appellant that no verdict for appellee based on this evidence could or should ever stand.

For the reasons set forth above, we reverse this case and remand with instructions for the trial court of Williamson County to enter judgment for the appellant Ford Motor Company.

Reversed and remanded with instructions.

JONES, P. J., and KARNS, J., concur.