CARL GENTEMAN, Plaintiff-Appellant, *v.* SAUNDERS ARCHERY COMPANY *et al.*, Defendants-Appellees.

First District (4th Division)  No. 61107

Opinion filed September 8, 1976.

Silberman, Gershon, Levinson & Edlin, Ltd., of Chicago (Philip Z. Levinson, Jules S. Gershon, and Jerome Marvin Kaplan, of counsel), for appellant.

Menk, Bishop and Kezelis, of Chicago (Algimantas Kezelis and John T. Mehigan, of counsel), for appellee Saunders Archery Company.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Carl Genteman, the plaintiff, was injured while target practicing at an archery range. He brought this action against the owner of the archery range, who did not defend, and the Saunders Archery Company, the manufacturer of the alleged defective product, based upon a theory of strict products liability. After commencement of trial, the defendant was permitted to assert the affirmative defense of misuse. A jury verdict was returned in favor of the defendant. This is an appeal from the denial of a post-trial motion for judgment notwithstanding the verdict.

On February 1, 1970, the plaintiff purchased at an archery range shop a package containing four "string silencers" to quiet the string of his bow. According to his testimony, he put the silencers on using a bobby pin, pursuant to the instructions on the package, and fired it numerous times. When he finished shooting, he unstrung his bow and put it in his case. On the following day, February 2, the plaintiff returned to the range and fired a few times. Then, according to his testimony, when he again drew back on the bow and released, the silencer broke, hit the bottom of the bow, bounced back and hit his eye, causing him to feel pain. He became dizzy and passed out. His brothers assisted him and, after regaining consciousness, he was taken home and subsequently to the hospital. Genteman left the hospital the same evening.

The next day, the plaintiff went to see Dr. Burton Russman who examined his eye and sent him to the hospital where surgery was performed on the injured eye. He remained hospitalized for about 2 weeks and under the care of Dr. Russman up to and including the time of trial. About 3 months after the accident, he returned to work. Plaintiff testified that his vision is unclear, that he has headaches daily and sees shadows and things floating in his eye. As a result of the injury, it is necessary for him to wear sunglasses to keep out sunlight.

On cross-examination, the witness stated that he put the silencers on from each side of the string, that he used a ruler to place them 8 to 14 inches from end to top, and that the tab was sideways, facing outward. He further testified that the maximum number of shots he took on February 1, the day before the accident, was 40 to 60, and 6 or 7 were taken just prior to the accident. Plaintiff conceded that he did not actually see the silencer break off and hit his eye, but instead, heard something snap and then noticed that the silencer had broken.

Dr. Burton Russman, a licensed physician specializing in ophthalmology, testified that he examined plaintiff at his office on February 3, 1970. The right eye was found to be normal, but vision in the left eye had diminished to 20/60; there was a level of blood inside the anterior chamber; and the iris itself was pulled down and pushed back. The doctor advised immediate hospitalization and thereafter performed an operation to remove the blood clot. Dr. Russman further testified that plaintiff still had some clots in the vitreous fluid; that his pupil was dilated; and that a small spot or cataract remained in the lens of the eye.

Dr. Lawrence Broutman, an Illinois Institute of Technology professor of materials engineering, specializing in plastics and reinforced plastics, testified that in May 1972, the archery bow with string intact and four string silencers attached were delivered to his office, along with an extra package of silencers. He performed tests which measured the hardness value of the silencers to be 63 on the "Shore A" scale and a chemical analysis which indicated that the material was made of styrene butadiene. Similar tests were conducted in September 1972 on another type of silencers which were black instead of brown like the others. The black silencers were made of polyvinyl chloride and had a hardness value of 86. Dr. Broutman stated that the larger the value, the harder the material and that if the hardness value on a plastic material could be co-related with strength, the harder the material, the stronger it would be. He also indicated that the tapered design of the black silencer would reduce changes in stresses and lower the stresses when the bow string was shot. In response to a hypothetical question, the witness expressed his opinion that the stress produced in shooting arrows 20 to 60 times could have caused the silencer to fail.

On cross-examination, Dr. Broutman testified that he did not make tests to determine the force required to pull the bow back, the spreads involved in the shooting process, or how the string acted when released. He stated that although hardness is related to strength, it is not equivalent. The tensile strength (the ability to carry a load without breaking) was not readily testable and the doctor conceded that it is difficult to arrive at a conclusion about such strength without measuring it. He was therefore unable to form an opinion about the silencer's tensile strength. No experiments were conducted with firing the bow. The witness was unable to tell how the silencers acted at the time of firing, except that they would be subject to stress, or to determine the magnitude of the stress, or the number of times stress would be applied to the silencers in a firing cycle. It was acknowledged that the speed of the string on release, the rate at which the string was stopped, and the number of vibrations were essential to determine the kind of stress and the point at which the object would break. Dr. Broutman also admitted that when he certified the silencer could break in 20 to 60 firings, his testimony was based in part on conjecture.

The president of the defendant Saunders Archery Company, C.A. Saunders, testified that he had been in the archery business for 34 years, manufacturing the brown styrene butadiene silencer from 1965 to 1968 and the black polyvinyl chloride from 1968 to 1972. Since 1973, the company had been manufacturing a new coil spiral silencer. Saunders explained that the purpose of a silencer is to slow down the vibration of the bow string. He stated that the design of the brown styrene butadiene silencer resulted from the testing of competing products for strength and effectiveness which indicated that a silencer with a flexible stem out from the bow string would follow the string as the bow was shot, then flip over and reverse as the string vibrated, reducing the vibrations. This delayed reaction produced a more effective silencer in his opinion.

Tests and surveys showed that there were only two plastics commonly available which could be seriously considered: polyvinyl chloride and styrene butadiene. The black polyvinyl chloride was considered unsatisfactory because it had a tendency to change characteristics in cold weather and its tensile strength was not as great as the brown styrene butadiene. Styrene butadiene was found to be more flexible and could be flexed 2,000,000 times before any deterioration developed. The company manufactured the brown styrene butadiene string silencers for several years, then changed to the polyvinyl chloride because it was easier to produce. The company had learned that the manufacturer made a temperature compensated polyvinyl chloride. This material had been tested for a 2-year period and found to be satisfactory. Field testing also indicated there were no problems. Saunders testified that a change in

design was instituted because plant and field experiments showed that there was no need for the rib, or raised portion, which appeared on the earlier model. The old product was not recalled, but returns were accepted from dealers. Saunders further testified that the purpose of the bow string silencer is for shooting game, as opposed to a target.

Marvin Salzenstein, a consulting engineer retained by the defendant, testified that he examined the brown styrene butadiene silencers in evidence visually and microscopically. He explained that styrene butadiene is a very flexible material with a comparatively high tensile strength and opined that styrene butadiene was an appropriate material for the bow string silence. On cross-examination, the witness stated that his testimony was based on handbook values, not on tests performed on the silencers.

■■ In order to recover under a strict products liability theory, the plaintiff must prove: (1) his injury resulted from a condition of the product, (2) the condition was unreasonably dangerous, and (3) the condition existed at the time the produce left the manufacturer's control (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182; *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298 N.E.2d 289.) The plaintiff states that in product liability cases, evidence that the product has been changed after the occurrence of an accident is relevant in determining that there are design alternatives. To prove that the silencers were defective when they left defendant's control, he has attempted to establish that there was a design alternative readily available which would have averted the injury, that this design alternative was instituted 2 years after the brown silencers were on the market, but that the defendant failed to recall the earlier model. The essential propositions and facts to support this position are that the black polyvinyl chloride is a harder material than the brown styrene butadiene, that the design of the black silencer was such that it would be subject to lower stresses when the bow string was released, and that the stresses imposed upon the brown silencer could have caused it to fail.

Design alternatives are appropriately considered in the development of product's liability principles where liability is predicated upon strict tort liability (*Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 319, 281 N.E.2d 749), and Illinois courts have accepted evidence tending to show what is feasible and what the defendant knew or should have known (*Neighbors ex rel. American States Insurance Co. v. City of Sullivan* (1975), 31 Ill. App. 3d 657, 660, 334 N.E.2d 409). However, the jury was not required to accept plaintiff's evidence to the exclusion of all other and much of this testimony was, in fact, controverted. The president of the archery company testified that styrene butadiene was originally used because it was more flexible and the other available

material, polyvinyl chloride, changed characteristics in cold weather. The company changed from styrene butadiene to polyvinyl chloride not because the latter was determined to be superior, but because tests showed the material could be cycled through the plastic injection machines faster and the weathering factor was overcome by its manufacturer. Defendant's expert witness testified that reports showed the original material, styrene butadiene, had a higher tensile strength than the polyvinyl chloride and the hardness factors were in the same range. There was also testimony that Company experiments indicated there was no need for the raised rib portion which appeared on the brown model and for this reason it was eliminated. The jury reasonably could have chosen to believe the design change did not establish the existence of a defect in the product when it left the manufacturer's control. Where a verdict is not clearly against the manifest weight of the evidence, it will not be set aside by a reviewing court. *Lipschultz v. So-Jess Management Corp.* (1967), 89 Ill. App. 2d 192, 203, 232 N.E.2d 485.

Furthermore, the jury could have reasonably believed that the defendant had proved the affirmative defense of misuse which asserted that the plaintiff had misused the silencer (a) by not mounting it in accordance with the instructions and (b) by using the silencer for target practicing instead of hunting. The unrebutted evidence established that the plaintiff placed the silencers sideways to the bow string, instead of trailing the bow string as the instructions stated, and that the mounting tabs were compressed together, also contrary to the directions which appeared on the string silencer package. The president testified that the silencers were to be used for hunting in order to reduce noise. The firings there would be relatively few—only when game was found. The plaintiff took 40 to 60 shots with the silencers in place on the first day, and 6 or 7 shots just prior to the accident.

This court has previously noted the distinction between use and wear, and a defect which causes the product to be unreasonably dangerous; the longer a product has been out of the control of the manufacturer and in active use by the consumer, the greater the likelihood that some intervening instrumentality, such as unforeseen misuse, may have caused the failure. (*Mullen v. General Motors Corp.* (1975), 32 Ill. App. 122, 130, 336 N.E.2d 338.) In this case, silencers had been attached improperly and subjected to many more shootings than would normally occur while hunting game, which is the only time that silencers are necessary. The doctrine of strict liability in tort does not make a manufacturer an insurer with respect to use of his product (*Shramek v. General Motors Corp.* (1966), 69 Ill. App. 2d 72, 81 216 N.E.2d 244), or require that a product be accident-proof (*Denton v. Bachtold Brothers, Inc.* (1972), 8 Ill. App. 3d 1038, 1040, 291 N.E.2d 229).

The trial judge acted properly in allowing the defendant to file this affirmative defense during the course of the trial. Courts should be liberal in allowing amendments to pleadings to entitle the plaintiff to sustain the claim to be brought or the defendant to make a defense. *Helle v. Brush* (1971), 2 Ill. App. 3d 951, 954, 275 N.E.2d 688, *rev'd on other grounds,* 53 Ill. 2d 405, 292 N.E.2d 372.

■■ ■ Plaintiff next contends that the trial court committed certain errors in its instructions to the jury. We disagree. Since the defendant was entitled to raise the affirmative defense of misuse, there was no error in allowing the tendered instruction on this defense. The judge declined to give instructions concerning the duty to warn where the product is anticipated to be dangerous or the duty to properly instruct regarding use of the product. This was justified because these issues were not developed at trial or predicated on evidence in the case. There was no evidence that the product reasonably should have been considered dangerous or that the package instructions were deficient, ambiguous or incorrect. Instructions to the jury which contain rules of law not applicable to the facts of the case are defective. *Gasperik v. Simons* (1970), 124 Ill. App. 2d 360, 364-65, 260 N.E.2d 458.

■■ We find plaintiff's contention that the trial court should have directed a verdict to be without merit. The well-established rule is that directed verdicts should be entered only where all the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Plaintiff's evidence fell woefully short of this standard and the trial court was correct in refusing to direct a verdict for the plaintiff.

For the foregoing reasons, the judgment appealed from is affirmed.

Affirmed.

ADESKO and DIERINGER, JJ., concur.