LLOYD ROBERT CURRY, Plaintiff-Appellant, *v*. LOUIS ALLIS COMPANY, INC., *et al*., Defendants-Appellees.

First District (4th Division)    No. 80-2326

Opinion filed September 24, 1981.—Rehearing denied October 29, 1981.

Joseph A. Rosin, of Chicago, for appellant.

Wildman, Harrold, Allen & Dixon, and James K. Toohey and Fred W. Mattlin, both of Ross, Hardies, O'Keefe, Babcock & Parsons, both of Chicago (Thomas T. Allen and John E. Frey, of counsel), for appellees.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

This suit is a products liability action brought for injuries suffered when a motor, having been improperly installed, fell off a drop hammer. The suit was brought against the manufacturer, Louis Allis Company, Incorporated (Allis), the seller, Central Motor & Repair Company (Central), and the assembler of the total machine, Chambersburg Engineering Company, Incorporated (Ceco). The trial court concluded Allis and Central were not liable for the injuries and granted their motion for summary judgment.

We affirm.

Allis is the manufacturer of electric motors. Prior to 1965, it manufactured electric motors designed for use on board drop hammers. In 1964, it withdrew from that market and since then has manufactured only general purpose drive motors. The motor involved in the present case was a general purpose drive motor manufactured according to standard, industry-wide specifications established by the National Electrical Manufacturers Association. It was advertised for use in foundries and related industries and was commonly used in hundreds of varied applications such as pumps, machine tools, compressors and refrigeration units. The motor's cast iron housing was forged according to specifications which call for a tensile strength of 30,000 pounds per square inch (psi).

Central is engaged in the business of rebuilding and repairing electric motors. Incidental thereto, it placed orders for new electric motors for its customers from various motor manufacturers including Allis. It was not an authorized Allis distributor, nor did it regularly sell or distribute Allis products directly. It did sell the motor involved in this case to plaintiff's employer on or about July 31, 1974.

The plaintiff, Curry, was an employee of Cornell Forge Company. Cornell is engaged in the forging business. At the time of the accident it had on its premises numerous hammers in addition to the drop hammer involved in this occurrence. It maintained an inventory of spare hammer parts, motors and mounting assemblies and purchased standard drive

motors from other manufacturers besides Allis. It had experienced motor feet fractures with these motors as well. Cornell performed its own repairs on the hammers, including the installation of replacement drive motors as needed. In addition, it shipped motors to independent contractors which welded motor casing fractures. It never notified Allis or sought its advice if motor frames fractured.

The 2,000 pound board drop hammer involved in the accident was designed, manufactured and sold by Ceco. Its principal components included the hardware for the hammer itself, a drive motor and a shock mounting system by which the drive motor is mounted on top of the hammer. This shock mounting system was developed by Ceco after Allis discontinued manufacture of the specialized motors so that the hammer could be powered by general purpose drive motors.

In 1966 Cornell purchased from Allis and had sent to Ceco a motor for inspection and testing with the 2,000 pound drop hammer. After testing, Ceco approved the use of the motor on the drop hammer conditioned on Cornell's use of the Ceco-designed shock mounting system. It also required use of its double element coupling. Ceco provided Cornell with detailed instructions and drawings as to the proper method of mounting and coupling the motor to the hammer. However, while several Cornell personnel, including the purchasing agent and plant manager, had these instructions and drawings, they had not been given to anyone in the maintenance department.

On September 5, 1974, the motor then in use was observed to be shaking. The hammer was shut down and the night shift maintenance crew was instructed to install the new Allis motor. Floyd Bradshaw was the lead man on this crew. Not only did he not have any instructions or drawings, but he was not able to find the required shock mounting assembly and double element coupling although in fact Cornell did have some units in stock.

When Bradshaw could not locate a complete shock mounting assembly in the Cornell toolroom, he used the worn parts from the previous assembly, which included only two of the necessary four mushroom-head bolts and only six of the necessary eight neoprene cups. To replace the two missing mushroom-head bolts Bradshaw used two improper, standard hex-head bolts which had a smaller and differently shaped head and a wider threaded shaft than the mushroom bolts included in the Ceco shock mount assembly kit. Although each bolt required two rubber cups for correct installation and proper shock isolation, Bradshaw used only one rubber cup with each hex-head bolt.

Because the standard hex-head bolts were too large to fit through the premachined holes in the feet of the Allis motor, Bradshaw drilled and enlarged the motor mounting holes to accommodate the improper hex-

head bolts. He then "snugly" tightened the two hex-head bolts and two partially worn rubber cups without the use of the proper castellated nuts which permit the insertion of a cotter pin to secure the mount. The instructions regarding the motor shock mount stated that the mushroom bolts should be finger tight, then tightened only an additional half turn in order to allow the motor the benefit of the float generated by the shock assembly, thus protecting the motor from the extreme vibrations generated in the Ceco hammer. Because he had not found the series shock mount assembly with the packing instructions, Bradshaw was unaware of the proper assembly procedures, and when he "snugly" tightened the mushroom bolts, he destroyed the "float" effect of the shock mounting system. About six hours after the hammer was put back into service, the motor fell severely injuring plaintiff. An inspection report by Ceco revealed that:

"(d) At approximately 5:30 a.m.—after approximately six hours service—the front two mounts failed by the hex-head bolts pulling through the Body, 285. Apparently, at this point both of the front motor feet broke off. This caused an unstable condition and the rear two motor feet broke causing the motor to tear loose from the coupling and fall upon the Trim Press operator.

(e) Customer has put aside the damaged motor, the four feet, and the motor mounts involved. I inspected the feet and all failures were clean indicating a sudden fracture. The Bodies, 285, of the mounts were deformed at the bore where the hex head pulled through. The Hard Rubber, 323, from the top side seemed to be in good condition."

Plaintiff's own expert in his report said that the mounting legs had a tensile strength of 35,000 psi; that it was within normal industrial quality; that there were no significant, inherent casting defects; and that the casting appeared to be sound and of normal industrial quality. He concluded that the fracture was the result of forces exceeding the strength of the legs and the basic material.

Curry's suit against Allis and Central contended that:

"(a) The motor frame incorporated into said Drop Hammer was made of cast iron of insufficient strength to withstand the vibrations created by said Drop Hammer when in use;

(b) The motor and motor frame incorporated into said Drop Hammer were not sufficiently safeguarded so as to prevent the motor and motor frame from falling from position on said Drop Hammer;

(c) [Defendant] failed to properly warn users of said Drop Hammer that the motor frame was of insufficient strength to withstand the vibrations generated by the Drop Hammer."

It is clear from the arguments below that Curry has at no time contended that the motor mount was defectively made. The trial court granted summary judgment to Allis and Central finding that there was "no showing of a breach of duty on the part of Allis and Central with respect to manufacture, design or warnings."[1]

■■ ■ A manufacturer is not an insurer of its product (*Genteman v. Saunders Archery Co.* (1976), 42 Ill. App. 3d 294, 355 N.E.2d 647, *appeal denied* (1977), 65 Ill. 2d 577; *Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 336 N.E.2d 338, *appeal denied* (1976), 61 Ill. 2d 602), and it is under no duty to make products incapable of causing any injury under any circumstance. (*Palmer v. Avco Distributing Co.* (1980), 82 Ill. 2d 211, 412 N.E.2d 959; *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368.) Before plaintiff can recover he must prove that the product, in this case the motor and motor frame, was unreasonably dangerous; that the condition or defect was in the product when sold by the manufacturer, that the assembler made no substantial change in the motor or motor frame and that the injury was directly attributable to a condition or defect in the motor or motor frame itself (*Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206, 407 N.E.2d 32; *Bobka v. Cook County Hospital* (1981), 97 Ill. App. 3d 351, 422 N.E.2d 999; *Peterson v. B/W Controls, Inc.* (1977), 50 Ill. App. 3d 1026, 366 N.E.2d 144; *Keen v. Dominick's Finer Foods, Inc.* (1977), 49 Ill. App. 3d 480, 364 N.E.2d 502; *Hepler v. Ford Motor Co.* (1975), 27 Ill. App. 3d 508, 327 N.E.2d 101, *appeal denied* (1975), 60 Ill. 2d 597), and an inference of defectiveness may not be drawn from the mere fact of injury. (*Huff v. Elmhurst-Chicago Stone Co.* (1981), 94 Ill. App. 3d 1091, 419 N.E.2d 561.) When defendants filed their motion for summary judgment, plaintiff was required to present some factual basis that would arguably entitle him to a judgment under the applicable law. (*Cuthbert v. Stempin* (1979), 78 Ill. App. 3d 562, 396 N.E.2d 1197.) Yet, here plaintiff produced no evidence of any kind tending to show either that the product was defective when it left the manufacturer's or distributor's hands or that, if it was, the defect rather than the improper installation caused the accident and resulting injury; furthermore the product was altered by the assembler. Accordingly, we conclude the court properly granted summary judgment for defendants.

Plaintiff relies on *Thomas v. Kaiser Agricultural Chemicals* (1980), 81

---

[1] Our determination of the facts has been rendered more difficult by appellant's failure to comply with the Supreme Court Rules requiring him to set forth a statement of facts giving the relevant facts with citations to the record and to set forth in the brief a table of contents to the record on appeal. We reiterate that while the court may search the record to affirm (*Board of Education v. Will County Board of School Trustees* (1971), 132 Ill. App. 2d 947, 271 N.E.2d 87, *appeal denied* (1971), 47 Ill. 2d 589), we are not required to search the record to reverse. *Geleto v. Giglietti* (1976), 40 Ill. App. 3d 226, 352 N.E.2d 1, *appeal denied* (1976), 64 Ill. 2d 595; *Crader v. Illinois Power Co.* (1971), 133 Ill. App. 2d 897, 272 N.E.2d 413.

Ill. 2d 206, 407 N.E.2d 32. In *Thomas*, the defendant Dover manufactured an adaptor which was incorporated without alteration into an applicator machine. The adaptor contained a check valve which prevented fertilizer in the applicator from being expelled from the applicator. However, the stem of the valve was so located on the adaptor that it could be easily bumped with a resultant expulsion of pressurized liquid. In *Thomas*, the accident was due to the improper positioning of the check valve; this valve was positioned by the defendant Dover; thus, the defect was in the component when it left Dover's hands. As we have already noted, in the present case there is no evidence that the accident was not due to the improper installation of the motor and motor frame. Hence the defect causing the injury was not in the component part when it left Allis' and Central's hands but was created later. Likewise in *Thomas* the court emphasized that there was no evidence to show that any change was made to the adaptor by the assembler; the assembler simply attached the adaptor to the top of the tank. In the instant case, Cornell did change the product by enlarging the holes in the feet. Finally, the supreme court in *Thomas* stated that if this particular adaptor and coupler could not have been safely used together, a warning to that effect should have been given. Here Cornell was given full notice that the motor could only be used if the proper assembly and coupler were employed. The defendants had a right to assume that the employer knew how to read these instructions and would carry them out. *Bakovich v. Peoples Gas Light & Coke Co.* (1963), 45 Ill. App. 2d 182, 195 N.E.2d 260.

■■ Plaintiff, relying on the safety device cases such as *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 319 N.E.2d 232, and *Derrick v. Yoder Co.* (1980), 88 Ill. App. 3d 864, 410 N.E.2d 1030, contends that Allis and Central had a nondelegable duty to see that the motor and motor frame were sufficiently safeguarded or secured so as to prevent them from falling. *Rios, Derrick* and the other Illinois cases finding a nondelegable duty to install safety devices where the machine is unifunctional all involved suits against the manufacturer of the final product, that is the assembler. It is within the power of the assembler to install a safety device on a machine. But the manufacturer of a component part has no control over that part once it is sold and has no control over the final assembly of the machine. Thus it would be absurd to hold the maker of some component, as for example the manufacturer of the rollers involved in *Karabatsos v. Spivey Co.* (1977), 49 Ill. App. 3d 317, 364 N.E.2d 319, liable because the assembler of the total machine did not put safety guards on it. As stated in *Jordan v. Whiting Corp.* (1973), 49 Mich. App. 481, 486, 212 N.W.2d 324, 328, *modified* (1976), 396 Mich. 145, 240 N.W.2d 468:

> "The obligation that generates the duty to avoid injury to another which is reasonably foreseeable does not * * * extend to the anti-

cipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another."

In *Rios*, itself, the supreme court held that once an employer has installed a safety device, the manufacturer is not liable even if the installed safety device fails.

■■ The plaintiff's allegation that the appellees failed to warn that the motor frame was of insufficient strength to withstand vibrations of the drop hammer is without merit because plaintiff produced absolutely no evidence tending to show that it was insufficient if properly installed and because both Ceco and Cornell were fully aware of the need for proper installation. Accordingly, Allis and Central had no duty to warn them of a fact which was already apparent. *Weiss v. Rockwell Manufacturing Co.* (1973), 9 Ill. App. 3d 906, 293 N.E.2d 375; *Collins v. Ridge Tool Co.* (7th Cir. 1975), 520 F.2d 591; *Jacobson v. Colorado Fuel & Iron Corp.* (9th Cir. 1969), 409 F.2d 1263; *Lockett v. General Electric Co.* (E.D. Pa. 1974), 376 F. Supp. 1201, *affirmed* (3d Cir. 1975), 511 F.2d 1394.

■■ Finally, the plaintiff in his brief appears to contend that Allis and Central should be held liable for manufacturing only cast iron frames as they were aware of the need for motor frames of a more durable and resilient nature, having made special motor frames in the past. As we have repeatedly noted, plaintiff produced no evidence to show that the frame would not have been adequate had it been properly attached. Nor did plaintiff produce evidence tending to show that the discontinued specialized frame would have been more durable and resilient if improperly installed. But even if it would have been better, defendants had no duty to produce a product which represented the ultimate in safety. (*Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859; *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368.) It is enough that, unlike *Kerns*, a safe use of the cast iron motor was practical.

For the reasons stated the judgment of the trial court is affirmed.

Affirmed.

JIGANTI and LINN, JJ., concur.