RONALD D. THOMAS, Plaintiff-Appellee, *v.* KAISER AGRICULTURAL CHEMICALS, Defendant-Appellant and Counterplaintiff-Appellee-Appellant.— (CERTIFIED EQUIPMENT AND MANUFACTURING COMPANY, Defendant-Appellee-Counterdefendant-Appellee and Third-Party Plaintiff; OPW CORPORATION, Third-Party Defendant and Counterdefendant-Appellant.)— RONALD D. THOMAS, Plaintiff-Appellee, *v.* KAISER AGRICULTURAL CHEMICALS, Defendant and Counterplaintiff-Appellee.—(CERTIFIED EQUIPMENT AND MANUFACTURING COMPANY, Defendant-Counterdefendant and Third-Party Plaintiff-Appellee-Cross-Appellant; OPW CORPORATION, Counterdefendant-Appellant and Third-Party Defendant-Appellant-Cross-Appellee.)

Fourth District   Nos. 15069, 15124 cons.

Opinion filed August 2, 1979.—Rehearing denied August 28, 1979.

W. J. Simhauser, of Springfield, for appellant OPW Corporation.

William R. Brandt, of Livingston, Barger, Brandt, Slater and Schroeder, of Bloomington, for appellant Kaiser Agricultural Chemicals.

Ray Moss, of Herrick, Rudasill and Moss, of Clinton, for appellee Ronald D. Thomas.

Michael J. Kehart, of Decatur, for appellee Certified Equipment and Manufacturing Company.

Mr. JUSTICE GREEN delivered the òpinion of the court:

This appeal involves a tort action brought in the circuit court of De Witt County by plaintiff Ronald D. Thomas to recover for personal injuries he received on April 24, 1974, when he was sprayed in the face with liquid nitrogen fertilizer while filling an applicator which he was using to apply the fertilizer to farm land. He sued defendants Kaiser Agricultural Chemicals (Kaiser), seller of the fertilizer and furnisher of the applicator, and Certified Equipment and Manufacturing Company (Certified), distributor of the part of the applicator alleged to be defective. Plaintiff sought recovery on both negligence and defective product theories. Certified filed a third-party complaint for indemnity against third-party defendant OPW Corporation, a division of Dover Corporation (Dover), manufacturer of the part alleged to be defective. Kaiser counterclaimed for indemnity against both Certified and Dover.

On March 21, 1978, prior to trial, the court entered summary judgment in favor of Certified and against Dover for indemnity in any amount that either plaintiff or Kaiser might recover against Certified. The

question of whether Certified was entitled to recover for attorney's fees or costs against Dover was reserved. On March 31, 1978, at the completion of a jury trial, the court entered judgments on verdicts: (1) in favor of plaintiff and against Kaiser for $50,000, (2) in favor of Certified and against plaintiff and Kaiser, and (3) in favor of Kaiser and against Dover for indemnity for Kaiser's liability to plaintiff. On August 7, 1978, after a post-trial hearing, the court awarded judgment in favor of Certified and against Dover for attorney's fees and costs in the total sum of $7079.67, representing fees and expenses incurred after the entry of the summary judgment.

On July 10, 1978, Kaiser filed notice of appeal as to the judgments against it and in favor of plaintiff and Certified. Kaiser contends that plaintiff assumed the risk of the defective product as a matter of law and that it is entitled to indemnity from Certified as a matter of law because it, Kaiser, purchased from Certified the part of the applicator alleged to be defective and, if the product was defective, it was in that condition at the time of that purchase. On July 7, 1978, Dover filed notice of appeal as to Kaiser's judgment against it. Dover asserts that: (1) although it made the part of the fertilizer applicator alleged to be defective, Kaiser selected the part and assembled the applicator and should be responsible, and (2) the court erred in excluding evidence. On September 11, 1978, we granted Dover leave to file late notice of appeal from Certified's judgment awarding it attorney's fees and costs against Dover. Certified cross-appeals from that judgment. Dover argues that no award of fees or expenses was proper. Certified contends that it was entitled to fees and expenses for its *entire* defense and not merely for those incurred after the summary judgment.

The case arises from a transaction whereby Kaiser sold liquid nitrogen agricultural fertilizer to plaintiff and his brother and in conjunction with the sale, provided them with the equipment to apply the fertilizer to the ground. This was done with an implement called an applicator which was mounted on wheels and pulled by a tractor. The applicator consisted of a tank containing the fertilizer and a system of conduits that carried the liquid fertilizer to blades which plunged into the ground as they deposited the fertilizer therein. The applicator contained a compressor which placed pressure on the liquid in the tank and forced it through the conduits and into the ground. The usual procedure for filling the tank was to do so by pumping the liquid fertilizer through hoses from a "nurse tank" in which the fertilizer had been stored.

At the top of the tank of the applicator furnished by Kaiser to plaintiff and his brother was an adaptor for connecting the hose from the nurse tank to the applicator's tank and through which the liquid fertilizer would flow from the former into the latter tank. This adaptor contained a

check valve to prevent the back flow of the liquid fertilizer from being expelled from the applicator tank when that tank was under pressure. The stem of the valve extended one-eighth of an inch above the lip of the adaptor. The following diagram illustrates the makeup of the adaptor in question.

633-FP Automatic Check Valve Adaptor

STEM

LIP

| | ALUM. | BRONZE |
|---|---|---|
| 1½" | X | X |
| 2½" x 3" | | X |

The adaptor was manufactured by Dover and sold by them to Certified who in turn sold the tank and adaptor to Kaiser. Kaiser assembled the applicator, placing the adaptor in the top of the tank. Directions in plain view on the applicator tank advised persons using the applicator to bleed it of all air pressure prior to filling it.

On April 24, 1974, the day of plaintiff's injury, he and his brother had been fertilizing fields with the applicator. Plaintiff's brother testified that prior to the attempt to fill the tank which led to plaintiff's injury, he bled air from the tank but did not check the pressure gauge on the top of the tank to see if the air pressure had been lowered to zero. According to the brother's testimony, the hose from the nurse tank had been handed to plaintiff who started to place the end of the hose over the adaptor when suddenly plaintiff's face was sprayed with liquid nitrogen. Plaintiff's testimony was similar to that of his brother except that he said he, plaintiff, bled the tank.

Plaintiff's theory of recovery was that the 1/8-inch extension of the valve core stem above the lip of the adaptor made the design of the adaptor defective because the stem was thus vulnerable to being bumped in a manner that would open the valve. If air pressure then existed in the

tank and the cup of the adaptor contained a residue of liquid nitrogen, the latter would be blown out and onto a person standing nearby. Professor Loren Body, an expert in agricultural engineering, testified that in his opinion, this was exactly what happened. Body thought the lip of the coupler on the feeder hose bumped the valve stem causing it to open and let air out of the tank. He concluded that some liquid nitrogen had remained in the adaptor cup since the last filling and this substance was blown into plaintiff's face by the escaping air. In the expert's opinion, the protrusion of the valve core stem created an unreasonably dangerous condition.

We first consider Kaiser's claim that plaintiff, as a matter of law, assumed the risk of the allegedly defective product. That defense was first defined in Illinois in the case of *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305. There, the supreme court set aside a judgment for damages for injuries resulting from an allegedly defective product. The trial court had stricken allegations in the defendant's answer that plaintiff had assumed the risk. The supreme court, however, held assumption of the risk to be a valid defense to a charge of defective product and cited with approval comment (n) of section 402A of the Restatement (Second) of Torts (1965), which distinguishes the doctrine of assumption of risk from the ordinary doctrine of contributory negligence. The court described the test of whether a defective product risk had been assumed by the injured person as a subjective one, based upon that person's understanding and appreciation of the risk and not upon the understanding and appreciation of a reasonably prudent person. The court also stated that the trier of fact was not bound by the injured party's testimony as to his state of mind but might also consider the surrounding circumstances. The court emphasized that ordinarily, the issue would be one for the trier of fact.

Kaiser asserts that plaintiff's knowledge, understanding, and appreciation of the danger he faced are undisputedly shown by the evidence that plaintiff had (1) farmed for 18 years, during 16 of which he used liquid nitrogen fertilizer, (2) knowledge of the instructions not to fill the tank unless the air pressure inside had been fully discharged, and (3) seen the stem of the check valve and knew how it operated. Kaiser relies on *Sweeney v. Max A.R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170. There a young, inexperienced carpenter had proceeded to pound in several special-purpose concrete nails. As he hit the head of the first 4 or 5 of them, the head broke off and sailed across the room. When he hit the head of the next nail, it shattered and a piece of it hit his eye, causing a serious injury. In a suit against the seller of the nails for defective product, the carpenter obtained a judgment for damages. The supreme court upheld the judgment stating that if the carpenter had been more

experienced he *might* have been held to have assumed the risk as a matter of law, but that the court would not so rule under the circumstances presented.

Kaiser argues that plaintiff was an experienced farmer with complete knowledge of the circumstance and dangers involved. We can assume that plaintiff knew he was dealing with a dangerous substance and should not have started to fill the tank without making sure that its air pressure had been released. In *Sweeney* the carpenter, who might have been held to have assumed the risk had he been more experienced, had actually seen the nails break. Similarly, in *Prince v. Galis Manufacturing Co.* (1978), 58 Ill. App. 3d 1056, 374 N.E.2d 1318, where the plaintiff was held to have assumed the risk as a matter of law, the plaintiff was aware of the particular defect which caused the injury.

On the other hand, in *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 303 N.E.2d 382, a wrongful death suit based on a defective product was brought when a man standing beneath a suspended clam-shell basket while directing hoisting operation was hit by the bucket when it fell. The plaintiff's theory was that a defect in the crane caused the bucket to fall. In affirming a judgment for the decedent's representative, the supreme court held that no question of decedent's assumption of the risk was presented because, even though decedent might have been negligent in standing beneath the bucket, he did not know of the defect in the crane.

■■ The case before us is more like *Reese* than *Sweeney* or *Prince* because we cannot determine as a matter of law that plaintiff appreciated and understood the risk arising from the extension of the valve core stem. We can conclude that plaintiff was aware that the liquid nitrogen was dangerous because of his experience. We can also conclude that he was negligent in not checking to see that all pressure was bled from the tank before he attempted to fill it because he had read the instructions. However, these conclusions and the fact that plaintiff had looked at the adaptor do not require us to conclude that plaintiff realized that the extension of the valve core stem made it vulnerable to being hit, causing the escaping air to blow liquid nitrogen out of the adaptor cup. (See II Dooley, Modern Tort Law §32.83 (1977).) *Brown Manufacturing Company* makes clear that the question of whether an injured party assumed the risk of a defective product is ordinarily for the trier of fact. This is such a case. Plaintiff did not assume the risk as a matter of law.

■■ Kaiser argues that it was entitled to judgment for indemnity against Certified as a matter of law because Certified distributed the allegedly defectively designed product to Kaiser. Although Kaiser's general theory is correct, it cannot here complain of the verdict upon which judgment in favor of Certified was rendered. The instruction given on the form of the

verdict in Kaiser's counterclaim against Certified and Dover was tendered by Kaiser and permitted the jury to find in favor of Kaiser and against Dover but not against Certified. *Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 357 N.E.2d 449.

We next consider Dover's contention that Kaiser was precluded, as a matter of law, from obtaining indemnity from it. Dover concedes that if Kaiser's claim against it was for a malfunctioning part, there would be no merit to its position. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182; *Liberty Mutual Insurance Co. v. Williams Machine and Tool Co.* (1975), 62 Ill. 2d 77, 338 N.E.2d 857.) It maintains, however, that it has no liability when the claim is for defective design and Kaiser (1) selected the type of adaptor to be used, (2) knew of the protrusion of the valve core, (3) determined where in the tank the adaptor was to be inserted, and (4) assembled the applicator. Dover relies primarily on *Jordan v. Whiting Corp.* (1973), 49 Mich. App. 481, 212 N.W.2d 324, *aff'd* (1976), 396 Mich. 145, 240 N.W.2d 468, and *Willeford v. Mayrath Co.* (1972), 7 Ill. App. 3d 357, 287 N.E.2d 502.

In *Jordan* the manufacturer of locking arms incorporated by another entity into a crane was ruled not liable, in warranty or for negligence, to an ultimate user for failure to make locking arms that never would get out of repair, requiring a repairman to do dangerous climbing to fix them. The court noted that the manufacturer of the locking arms could not be held to have foreseen how the component would be fabricated into the completed crane. In *Willeford* a manufacturer sold the component parts of farm elevators to a dealer who assembled them and sold them at retail. The manufacturer supplied protective shields to be used over a dangerous mechanism in the elevator. Apparently the pricing arrangement established by the defendant was such that the shield was an extra item. The plaintiff, a user, was injured when caught in the dangerous mechanism of an elevator that had been sold by the supplier without a shield. The court held the manufacturer not to be liable to plaintiff for the defective design of the elevator assembled without a shield.

Dover disagrees with the statement in Restatement (Second) of Torts §402A, Comment on Caveat, that where a component part is, without change, incorporated into a larger unit by an assembler, "[I]t is no doubt to be expected" that the "strict liability of the manufacturer will carry through to the ultimate user." However, *Willeford* does not refute the foregoing as there the issue concerned the failure of the assembler to incorporate a part in the finished product and not the incorporation by the assembler of a defectively designed part.

Dover also attempts to draw an analogy to *Jordan* on the theory that here it did not know how the adaptor would be placed on the tank. It maintains that if the adaptor had been placed in a lower position on the

tank, any residue of liquid nitrogen would not have remained in the adaptor after filling but would have flown out by force of gravity. However, the top of the tank would be the obvious and logical place from which to fill the tank. Had the adaptor been placed low enough on the tank that residue of the liquid would have flown out of the adaptor, liquid from within the tank would have flown out without air pressure if the valve stem was jarred.

The adaptor was designed for a wide variety of uses, but Dover was aware that one of the uses was with liquid nitrogen application tanks. The fact that a component part may be put to a multiplicity of uses does not, of itself, relieve a manufacturer of liability for a defect of the component for a known use. *Texaco, Inc. v. McGrew Lumber Co.* (1969), 117 Ill. App. 2d 351, 254 N.E.2d 584.

Dover also argues that it should not be liable for defect in the design of the adaptor when Kaiser, the assembler, was also aware of any defect. The Kaiser purchasing agent had testified to having observed the slight protrusion of the valve core stem. Dover relies on provisions of section 388 of Restatement (Second) of Torts which concern the duty of a supplier to warn the user of a product of any danger in its use and absolves the supplier of responsibility if the danger is obvious to the user. The tort of defective product concerns primarily the duty of various entities in the chain of commerce to the ultimate purchaser and user. We have earlier ruled that the ultimate user here is not held, as a matter of law, to have known of the defect. No authority is called to our attention that knowledge of a defect is a factor in the establishment of liability for upstream indemnity.

■■ The facts of the case do not set forth an exception to the usual rule that the manufacturer of a defectively designed product is liable in indemnity to a subsequent seller in the chain of commerce who has become liable to a user because of the defect.

Dover's claim that evidence was improperly excluded concerns the court's refusal of an offer of proof to show that it, Dover, manufactured and advertised, in a catalog shown to Kaiser's buyer, a coupler with a built-in bridge device. If a coupler with this bridge device had been used on the hose from the nurse tank, the bridge would have made contact with the valve core stem of the adaptor in such a way that the valve would have remained open after the filling of the applicator tank was complete and until the feeder hose was uncoupled, thus preventing fluid from accumulating and remaining in the cup of the adaptor. Prior to the offer of proof, the court had allowed a joint motion in limine by Certified and Kaiser and objected to by plaintiff and Dover to exclude this evidence. The principal reason given by the court for its ruling was that the parties had not had an opportunity for discovery concerning the bridge device.

The record is not entirely clear as to what the discovery problem was, but it appears that all counsel had known of the existence of the device for two weeks prior to trial.

Regardless of whether the parties had ample opportunity for discovery, the exclusion of the evidence would not be reversible error if it lacked materiality or relevancy. The evidence would tend to show that Kaiser had available and knew of a different and safe way to assemble the total apparatus furnished to plaintiff and his brother. We do not find this evidence to be relevant to a material issue. The existence of the bridge device would not have prevented the adaptor from being inserted without change into the applicator tank in a manner contemplated by Dover. The bridge device was an item to be attached to the hose from the nurse tank but was not part of the adaptor or the applicator. Due care might have required Kaiser to have provided a feeder hose with such a coupler attached but care is not an issue in a strict liability, defective product case on the question of the right of the injured party to recovery nor has it yet been considered an issue as to contribution among those manufacturing and distributing the allegedly defective product. (See *Skinner v. Reed-Prentice Division Package Machinery Co.* (1978), 70 Ill. 2d 1, 374 N.E.2d 437.) The rejection of the offer of proof was not error.

The appeal and cross-appeal arising from our order of September 11, 1978, allowing Dover leave to file late notice of appeal, concerns the allowance of attorney's fees and expenses by way of indemnity to Certified. In *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859 the supreme court has recently held that unless a statute or agreement between the parties so provides, a tort defendant entitled to indemnity from another entity has no right against that entity for attorney's fees or expenses of litigation incurred in either defending the tort claim or suing for indemnity. Here, there is no such statute or agreement.

Accordingly, the award to Certified of attorney's fees and expenses is reversed. All other judgments from which appeal is taken are affirmed.

Affirmed in part, reversed in part.

MILLS and TRAPP, JJ., concur.