(No. 52507.—

RONALD D. THOMAS, Appellee, v. KAISER AGRICULTURAL CHEMICALS *et al.* (OPW Corporation, Appellant; Kaiser Agricultural Chemicals, Appellee and Cross-Appellant; Certified Equipment and Manufacturing Company, Appellee).

*Opinion filed June 20, 1980.*

RYAN, J., dissenting.

W. J. Simhauser, of Heckenkamp & Simhauser, P.C., of Springfield, for appellant.

Ray Moss, of Herrick, Rudasill & Moss, of Clinton, for appellee Ronald D. Thomas.

William R. Brandt and Richard E. Stites, of Livingston, Barger, Brandt, Slater & Schroeder, of Bloomington, for appellee Kaiser Agricultural Chemicals, Division of Kaiser Aluminum & Chemical Corp.

Michael J. Kehart, of Welsh, Kehart & Shafter, P.C., of Decatur, for appellee Certified Equipment & Manufacturing Co.

MR. JUSTICE MORAN delivered the opinion of the court:

The plaintiff, Ronald D. Thomas, brought this suit in the circuit court of De Witt County for personal injuries received when his face was sprayed with liquid-nitrogen fertilizer as he attempted to fill a fertilizer-applicator machine with the liquid. The complaint charged defendants with both negligence and strict products liability for defective design. Defendants are: Kaiser Agricultural

Chemicals (Kaiser), seller of the fertilizer, who, in connection with that sale, supplied the applicator machine; and Certified Equipment and Manufacturing Company (Certified), the distributor of the allegedly defective component part that was incorporated into the applicator machine. Certified filed a third-party complaint for indemnity against OPW Corporation, a division of Dover Corporation (Dover), the manufacturer of the component part alleged to be defective. Kaiser counterclaimed, seeking indemnity from both Certified and Dover.

After a jury trial, the court entered judgments on the verdicts (1) in favor of plaintiff and against Kaiser for $50,000, (2) in favor of Certified and against plaintiff, (3) in favor of Certified and against Kaiser for indemnity, and (4) in favor of Kaiser and against Dover for indemnity. The appellate court affirmed the judgment of the circuit court relative to the jury verdicts but reversed the allowance of attorney's fees, an issue not before us on appeal. (74 Ill. App. 3d 522.) We allowed Dover's petition for leave to appeal, and Kaiser cross-appeals.

Kaiser claims (1) that the judgment for plaintiff should be reversed because, as a matter of law, the plaintiff assumed the risk of the allegedly defective component part, and (2) that because Certified is a wholesaler in the distributive chain of the allegedly defective product, Kaiser is entitled to indemnity from Certified as a matter of law. Dover contends (1) that, absent a functional failure of a component, the manufacturer of the component is not required to indemnify an assembler who selects and installs the component part in a finished product, and (2) that the trial court erred in its ruling which prevented Dover from introducing evidence to show that it made a companion part which, if used with the allegedly defective component in question, would have avoided the injury to plaintiff.

In April 1974, to fertilize their farms, plaintiff and his brother, Robert Thomas, purchased from Kaiser the stated

fertilizer. In connection with this sale and without charge to plaintiff or his brother, Kaiser supplied a fertilizer applicator. The applicator, a 300-gallon-capacity tank mounted on wheels, is made to be attached to the rear of a tractor that pulls the applicator over the soil while a system of blades deposits the pressurized fertilizer from the tank into the churned ground.

An adaptor, located at the top of the applicator, is a cylindrical device, approximately three inches in length. It is threaded at one end, allowing it to be screwed into and fastened to the top of the applicator tank. At the outer circumference of the other end of the adaptor is a specially designed annular groove to which a supply hose attaches for filling the applicator. This adaptor is the entry point for the fertilizer, which is pumped into the applicator from a larger tank-storage unit called a "nurse tank." The hose from the nurse tank is specially fitted with a coupler which clamps onto the upper end of the adaptor at the annular groove and is locked on with two attached arm clamps called "kamlocks." Once the hose coupler is attached to the adaptor and clamped with the kamlocks to prevent any leakage, air pressure is applied to the nurse tank to force the fertilizer to flow into and fill the applicator tank.

The adaptor contains a check valve which blocks the threaded lower end of the adaptor to prevent the fertilizer from being expelled from the applicator. The check valve can be opened by depressing a stem attached to the check valve. This stem extends approximately one-eighth inch above the upper lip of the adaptor. The check valve also can be forced open by the pressurized flow of fertilizer from the nurse-tank hose.

In addition to the adaptor, an air-pressure-relief valve and an air-pressure gauge are located on the top of the tank alongside a decal listing instructions for the use of the applicator. One of the listed instructions directs the user, before attempting to fill the applicator, to bleed all the

air from the applicator tank until the pressure gauge reads zero.

At trial, the plaintiff testified that, although he had been farming for 18 years, he had used the Kaiser applicator only once before—in 1966. Plaintiff stated that he had generally used anhydrous-ammonia fertilizer and was not, as a user, familiar with the harmful properties of liquid-nitrogen fertilizer. He stated that both he and his brother had read the decal instructions pertaining to the filling of the applicator before the April 24, 1974, accident occurred. On that date, plaintiff and his brother worked together in applying the fertilizer to their land. Plaintiff testified that, in preparation for refilling the applicator tank, he bled off the tank's air pressure and heard the hissing sound of released air. He did not check the air-pressure gauge to see if it read zero. Plaintiff took the hose leading from the nurse tank and attempted to attach the hose coupler to the adaptor in preparation for filling. He testified that he did not know that the stem on the check valve protruded above the lip of the adaptor where the hose coupler was to be attached. Plaintiff stated:

> "As I approached the adaptor with the coupler I didn't get it on there correctly and in a second or less than that I got sprayed in the face with the liquid fertilizer. *** I apparently bumped the check valve."

The testimony of plaintiff's brother was substantially the same, except that he claimed to have bled the air pressure from the applicator immediately before the accident occurred.

Plaintiff's expert witness, Professor Loren Body of the University of Illinois department of agricultural engineering, testified that, in his opinion, the injury occurred because a quantity of liquid-nitrogen fertilizer was trapped by the check valve and remained above it in the cup of the adaptor after the prior filling operation. When, in an attempt to attach the hose coupling, plaintiff accidentally

bumped the protruding stem of the check valve, the check valve opened, allowing pressure to be released from the tank and ejecting the fertilizer trapped in the adaptor. In Professor Body's opinion, the one-eighth inch protrusion of the valve-core stem created an unreasonably dangerous condition.

The evidence presented at trial revealed that the applicator was assembled by Kaiser. The parts, including the adaptor in question, were purchased by Kaiser from Certified, which was the distributor for the manufacturer, Dover. There was no evidence to show that Certified made any recommendation or advised Kaiser as to what component parts to purchase.

Dover's manager of engineering testified that he was aware that some of Dover's customers used liquid-nitrogen fertilizer and that the adaptor had been used in the fertilizer business for over 20 years.

We first address Kaiser's contention that the plaintiff, as a matter of law, assumed the risk of the allegedly defective adaptor.

In *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, this court established the rule that a plaintiff's contributory negligence is not a defense in a strict products liability tort action. If, however, the plaintiff's action amounts to an assumption of the risk, recovery for any injury incurred will be barred. A plaintiff assumes the risk of a defective product only if he is actually aware of the defective nature of the product and appreciates its unreasonably dangerous character, but chooses voluntarily to act in disregard of such known danger. *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 426, 430; *Court v. Grzelinski* (1978), 72 Ill. 2d 141, 149; Restatement (Second) of Torts, sec. 496D (1965).

The test for assumption of risk, established in *Williams,* is a subjective one which allows the jury to consider the individual plaintiff's knowledge, experience and back-

ground in determining whether he has assumed the risk of using a product known by him to be dangerous. This determination is normally a jury question. Kaiser claims that, since this plaintiff had been farming for 18 years and had used fertilizer machinery on his farm and on the farms of his neighbors, he should be held as a matter of law to have assumed the risk in this case.

Plaintiff testified, however, that he had used Kaiser's machinery only once before, eight years prior to the instant accident. His previous experience had been with anhydrous-ammonia fertilizer which has properties markedly different from those of the liquid nitrogen that caused his injuries. He stated he was not aware that the stem of the adaptor's check valve protruded or that it was dangerous. Moreover, the plaintiff thought he had released the air pressure within the applicator and that, consequently, it was safe to proceed to fill the applicator. Although the plaintiff may have been negligent in not checking the air-pressure gauge for a "zero reading," his actions do not indicate a voluntary decision to face a known danger. Under the circumstances, the jury was free to find that plaintiff's actions did not amount to an assumption of risk.

Kaiser also argues that it was entitled to a judgment for indemnity against Certified as a matter of law because Certified was the distributor who sold the allegedly defective adaptor to Kaiser.

It is true that in a products liability action, all persons in the distributive chain are liable for injuries resulting from a defective product. This includes suppliers, distributors and retailers. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 344. See *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 617.) However, in the present case, the following instruction, tendered by Kaiser, was submitted to the jury:

"If you find that Kaiser Agricultural Chemicals is entitled

to reimbursement from one of Certified Equipment and Manufacturing and OPW Corp., A division of Dover Corp., but not both, then you should use the form of verdict which says:

'We, the Jury, find for Kaiser Agricultural Chemicals and against the following defendant _____.
We further find for _____ and against Kaiser Agricultural Chemicals."

Where, as here, the record shows that a defendant's tendered instruction was given to the jury and that an option within that instruction provided the verdict form by which the jury could find for one of the defendants but against another, the tendering defendant has waived any error when the jury exercises that option. (*Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 575.) Accordingly, Kaiser cannot now claim error because the jury used the verdict form supplied by Kaiser to find for Certified and against Kaiser on the issue of indemnification.

Dover argues that it should not be liable to Kaiser for indemnification as a matter of law. Dover's theory is that the manufacturer of a component part, incorporated into a machine by an assembler, would not be liable to a user of that machine if the injury was not the result of a functional failure of that component part. Dover asserts that Kaiser was aware of the applicator's design characteristics and that the component part chosen by Kaiser was unsuitable for the purpose used. Dover concludes that Kaiser should therefore bear the sole burden of liability.

Section 402A of the Restatement (Second) of Torts, comment $q$, states:

"It is no doubt to be expected that where there is no change in the component part itself, but it is merely incorporated into something larger, the strict liability will be found to carry through to the ultimate user or consumer." (Restatement (Second) of Torts section 402A, comment $q$ (1965).)

This position was adopted in this State in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, wherein the court found that the manufacturer of a component part may be held liable where the assembler made no substantial change in the component part and the injury is directly attributable to a defect in such component part. *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623.

Dover's argument, that it should be relieved of liability, presumes that the adaptor in question was not defective at the time it left Dover. However, plaintiff's expert, Professor Body, testified that in his opinion the adaptor itself created an unreasonably dangerous condition because of the ease with which the valve's protruding stem could be bumped with a resultant expulsion of pressurized liquid. There was no evidence to show that any change was made to the adaptor by Kaiser. Kaiser simply attached the adaptor to the top of its tank. We therefore find no merit to Dover's argument that Kaiser should bear the burden of liability for plaintiff's injuries. The jury was entitled to find that the dangerous condition which led to plaintiff's injuries existed at the time the adaptor was manufactured by Dover. We find no reason to make a distinction in regard to liability between component-part manufacturers whose project malfunctions and those manufacturers whose product is faulty because of a design defect.

Dover further argues that Kaiser's use of the adaptor on its applicator amounted to misuse of the product. It claims that such adaptor was unsuitable for the use to which it was put and that Kaiser was aware of the design characteristics of the adaptor at the time Kaiser selected it. Generally, the misuse of a product by a supplier will defeat his right of indemnification from the manufacturer. However, if such misuse is reasonably foreseeable by the reasonably prudent manufacturer, it will not act to bar the liability of the manufacturer. (*Kerns v. Engelke* (1979), 76 Ill. 2d 154, 165; *Anderson v. Hyster Co.* (1979), 74 Ill. 2d

364, 369; *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1975), 62 Ill. 2d 77, 83.) When there is conflicting testimony as to whether a particular use was reasonably foreseeable, it is a question for the jury. *Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 369.

In the present case, Dover's manager of engineering stated that he was aware that some of Dover's customers used liquid-nitrogen fertilizer and that the adaptor had been used in the fertilizer business for 20 years. Although Dover argues that it was not aware of Kaiser's use of its adaptor, the testimony adduced at trial was sufficient to support the jury's finding that the use of Dover's adaptor in the manner described here was reasonably foreseeable.

Dover also argues that the trial court erred in excluding evidence that would show the adaptor could have been used in conjunction with another part manufactured by Dover. Dover claims that if Kaiser had selected a different hose coupler to use in conjunction with the adaptor, it would have prevented the accumulation of liquid fertilizer in the adapter cup and, thus, have avoided the instant accident.

Dover made an offer of proof which showed that the hose coupler actually used by the plaintiff and the coupler sought to be introduced by Dover were part of a line of products specially designed to be used interchangeably with Dover's various models of adaptors, including the one in question here. Since the focus of the issue in this case is the design of the adaptor itself, evidence of other products which could have offset the defective design of the adaptor is irrelevant. Dover could be held to have foreseen that the adaptor would be used with the various types of couplers and it had a duty to design the adaptor so that it would function safely with each. Further, if this particular adaptor and coupler could not have been safely used together, a warning to that effect should have been provided. We, therefore, hold that the trial court did not err

by excluding this evidence.

For the reasons stated above, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. JUSTICE RYAN, dissenting:

I disagree with my colleagues' treatment of the defense of assumption of risk. The opinion fails to focus on what I consider to be the controlling issue in the case—the disregard of an express warning concerning the manner of using the fertilizer applicator.

It was plainly established by the evidence that the plaintiff and his brother were farmers experienced in the application of fertilizer and had, in fact, been in the fertilizer-application business from 1960 through 1972, during which time they had applied anhydrous ammonia using applicators similar to the one used on the day of the accident, and the plaintiff had used the same type of equipment as that involved in this accident once before. Also, because of his experience, we can conclude that plaintiff knew of the dangerous propensities of both anhydrous ammonia fertilizer and of liquid nitrogen.

The evidence is also undisputed that on top of the fertilizer-applicator tank involved in this case, near the alleged defective adapter, was an air-pressure-relief valve, an air-pressure gauge, and a decal on which was plainly printed instructions that the user should bleed off all air pressure from the tank by opening the valve *until the pressure gauge reads zero.* The plaintiff had read and understood these instructions.

Although plaintiff stated that he opened the valve to release the pressure, it is undisputed that he *did not check the air pressure gauge to see if it read zero* before he attempted to attach the coupler to the adapter. In fact, plaintiff's brother testified that when he handed the coupler to the plaintiff, "there was possibly two or three

pounds of pressure" showing on the gauge. A witness called by plaintiff testified that if all the air pressure were released, there could be no injury from any liquid in the adapter; however, it would not be safe to attempt to fill an applicator tank without bleeding off *all* the pressure.

The majority opinion excuses the plaintiff's conduct by saying that he thought he had released the air pressure within the applicator. That excuse is about as valid as the proverbial "I didn't know the gun was loaded." It is no excuse at all, in view of the directions not only to release the air pressure but also to do so *until the air pressure on the gauge reads zero*. In complete disregard of these directions, the plaintiff did not look at the air gauge or ascertain that the air pressure on the gauge read zero before attempting to attach a coupler to the adapter. Plaintiff's injury can only be attributed to his direct violation of the directions plainly printed on the decal and with which he was familiar.

Comment *j* of section 402A of the Restatement (Second) of Torts (1965) states in part:

> "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."

The facts in this case are quite similar to those found in *Walk v. J. I. Case Co.* (1971), 36 App. Div. 2d 60, 318 N.Y.S.2d 598. In that case it was held that recovery was barred *as a matter of law* where the operator of a corn-picking machine was injured while removing corn husks from the snapping rollers of the machine, contrary to the instructions printed on a warning plate placed on the machine cautioning against cleaning the machine while it was in operation.

Another case in point is *Kay v. Cessna Aircraft Co.*

(9th Cir. 1977), 548 F.2d 1370. In that case the court, applying California law, held the manufacturer of a push-pull twin-engine aircraft was not liable on the theory of strict liability for the death of the pilot resulting from a crash on takeoff caused by the failure of the rear engine, which was obscured from the pilot's view. The court held that compliance with the pretakeoff procedures outlined in the owner's manual would have alerted the pilot to the fact that the rear engine had failed and the accompanying danger. The court upheld the trial court's order for judgment for the defendant notwithstanding the plaintiff's verdict.

A similar result was reached in *Stewart v. Von Solbrig Hospital, Inc.* (1974), 24 Ill. App. 3d 599, where the appellate court affirmed the order of the trial court which entered judgment for the defendant notwithstanding the plaintiff's verdict in a strict liability case. The evidence disclosed that a surgical pin failed when the plaintiff walked on his leg following removal of the cast. He had been instructed by the doctor not to put any weight on the leg after the cast was removed. See also 2 R. Hursh & H. Bailey, American Law of Products Liability sec. 8:25, at 212-13 (1974).

In *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, this court recognized that failure to heed the warnings in an instruction manual may constitute an affirmative defense of assumption of risk in a strict liability case. Under the facts of the case now before us I would hold, as a matter of law, that this affirmative defense bars recovery. Whether or not the plaintiff thought the air pressure had all been bled from the tank, the fact remains that he violated the specific instructions on the decal by attempting to attach the coupler to the adapter without ascertaining that the pressure gauge read zero. It was established by the evidence that if there would have been no air pressure in the tank, the fertilizer would

not have been blown from the adapter into the plaintiff's face. These warnings were placed on the equipment for the protection of those who use it. The law is well established that by failing to heed the warning the plaintiff assumed the risk of injury resulting therefrom. I must therefore dissent.