**The ESTATE OF Mark CAREY, Deceased, by Sharon CAREY, Independent Administrator, Wannetta Carter, John Gannon, Mary Anne Gannon and Paul Gannon, Plaintiffs,**

v.

**HY–TEMP MANUFACTURING, INC., a Nebraska Corporation, Therm–O–Disc, an Ohio Corporation, Defendants.**

No. 82 C 7171.

United States District Court, N.D. Illinois, E.D.

Nov. 17, 1988.

Edward R. Theobald, Robert V. Boharic, Karen L. Shoufer, Boharic & Theobald, Chicago, Ill., for plaintiffs.

Norman J. Barry Jr., Baker & McKenzie, Lyndon C. Molzahn, McKenna Storer Towe White & Farrug, John R. Doyle, Roger W. Wenthe, Douglas C. Tribble, McDermott Will & Emery, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

In this diversity products liability action, plaintiffs brought suit against defendants Hy–Temp Manufacturing, Inc. ("Hy–Temp"), the manufacturer of a furnace vent damper, and Therm–O–Disc, Inc. ("Therm–O–Disc"), a manufacturer of a component part for the damper. The plaintiffs' second amended complaint alleges that they suffered carbon monoxide exposure when the vent damper installed in their home failed to function and allowed a buildup of carbon monoxide. Therm–O–Disc has now moved for summary judgment, asserting that the plaintiffs have failed to identify any unreasonably dangerous or defective condition in the component they manufactured. For the reasons set forth below, Therm–O–Disc's motion for summary judgment is denied.

### Background

The allegedly defective product in this suit is called the "Heatnapper." The Heatnapper, designed by James Barth and manufactured by Hy–Temp under a license agreement with Barth, is a thermally activated vent damper. A vent damper "mounts in the vent pipe on the chimney side of the draft diverter of a gas-fired applicance, such as a furnace." Statement of Uncontested Facts ¶ 8. In general, a vent damper is designed to save energy by closing the vent when the furnace shuts off, so that the warm air inside will not escape to the outside. A thermally activated vent damper like the Heatnapper opens when it is heated, for example, when the furnace is on, and closes when it is cooled.

The opening and closing of the vent damper was controlled by a heat-sensitive helical coil. As a back-up system, Hy–Temp used a heat-sensitive switch manufactured by Therm–O–Disc. Therm–O–Disc's switch contains a "bimetal disc" composed of two different alloys of stainless steel. The particular bimetal disc used in the Heatnapper was enclosed in a metal casing, although Therm–O–Disc also made discs that are not enclosed but exposed. The two alloys in the bimetal disc have different coefficients of expansion, meaning that they expand at different rates when heated. Because the two alloys have different coefficients of

expansion, the bimetal disc changes from a flat shape to a curved shape when heated.

The Therm–O–Disc switch was placed on the outside of the Heatnapper, next to a hole about the size of a quarter, through which heated gases could flow. In theory, if the damper in the Heatnapper failed to open, then the gases would escape out the hole and heat the Therm–O–Disc switch. The heat would cause the bimetal disc in the switch to curve, and the curved disc would push a plunger. The plunger in turn was to open an electrical circuit, and this would have shut off the flow of the gas to the furnace. This is how the switch on the Heatnapper should have worked, but there is some dispute as to what actually happened.

A Heatnapper, Model GVD1–6, Serial No. 69622, with a Therm–O–Disc heat-sensitive switch, was installed at the home of plaintiff John Gannon in August 1981. Starting about November 25, 1981 until December 19, 1981, plaintiffs John Gannon, Mary Anne Gannon, Paul Gannon and Mark Carey, all of whom resided at the Gannon home, experienced headaches, nausea and flu-like symptoms. On December 19, 1981, plaintiff Wannetta Carter, who was employed in the Gannon home as a nurse, was hospitalized after becoming ill. Carbon monoxide concentrations were detected in her blood. The Gannons were alerted, and, after being tested, carbon monoxide concentrations were discovered in their blood also. The same day, the Heatnapper on the Gannon furnace was removed.

Carey, Carter and the Gannons brought suit against Hy–Temp in November 1982, and the suit was assigned to Judge George N. Leighton, who has since retired. In December 1983, the plaintiffs amended their complaint to include Therm–O–Disc and other defendants, but no claims against any of these other defendants remain. As amended, the plaintiffs' complaint alleges that the Heatnapper stuck in the closed position around November 25, 1981, and remained closed until it was removed on December 19, 1981. The plaintiffs advance various theories to explain why the Heatnapper failed to open, but for the purposes of this motion, these theories are not important. What is important is the plaintiffs' allegation that the Therm–O–Disc switch did not perform as intended and failed to shut off the furnace, even though the damper did not open. The plaintiffs allege that as a proximate result of the switch's failure to shut off the furnace, an abnormally high concentration of carbon monoxide built up in the Gannon home, which led to the plaintiffs' carbon monoxide poisoning.

In April 1985, the parties filed their final pretrial order, and Hy–Temp and Therm–O–Disc filed cross-claims for contribution against each other. In July 1986, after plaintiff Mark Carey died, the plaintiffs' complaint was amended for a second time to replace Mark Carey with Sharon Carey, the administrator of his estate. The second amended complaint also deleted all defendants except Hy–Temp and Therm–O–Disc, but is otherwise substantially the same as the first amended complaint. In December 1987, after Judge Leighton left the bench, this cause was reassigned to our calendar, and in June 1988, defendant Therm–O–Disc brought the motion for summary judgment that we consider in this opinion.[1]

## Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material facts and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d

---

1. It is not clear why Therm–O–Disc waited more than three years after the pretrial order was filed to move for summary judgment.

265 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

### Products Liability

■ The Illinois courts[2] have adopted the doctrine of strict products liability found in section 402A of the Restatement (Second) of Torts. *Suvada v. White Motor Co.*, 32 Ill.2d 612, 621, 210 N.E.2d 182, 187 (1965). As applied in Illinois, the law of strict products liability requires the plaintiff to prove that the injury resulted from a condition of the product, that the condition was unreasonably dangerous, and that the condition existed at the time it left the manufacturer's control. *Id.* at 623, 210 N.E.2d at 188; *see also Hunt v. Blasius*, 74 Ill.2d 203, 211, 23 Ill.Dec. 574, 578, 384 N.E.2d 368, 372 (1978); *Pierce v. Hobart Corp.*, 159 Ill.App.3d 31, 34, 111 Ill.Dec. 110, 112, 512 N.E.2d 14, 16 (1st Dist.), *appeal denied*, 117 Ill.2d 553, 115 Ill.Dec. 409, 517 N.E.2d 1095 (1987). It is clear that strict liability may be had against a component maker like Therm–O–Disc, if the component it makes is defective. Indeed, the case in which the Illinois Supreme Court first adopted section 402A involved the liability of a component maker. *Suvada*, 32 Ill.2d at 623, 210 N.E.2d at 188; *see also Thomas v. Kaiser Agricultural Chemicals*, 81 Ill.2d 206, 216–17, 40 Ill.Dec. 801, 806, 407 N.E.2d 32, 37 (1980).

Therm–O–Disc asserts, however, that there is no evidence that its component was defective and thus moves for summary judgment as a matter of law. Therm–O–Disc does not seriously contend that its switch turned off the furnace in the Gannon home. Rather, it contends that the switch would have worked, but that the design of the Heatnapper never allowed the switch to do its job. Specifically, Therm–O–Disc notes that Barth mounted the switch on the outside of the Heatnapper, next to a small hole. As noted previously, if the damper in the Heatnapper failed to open, then in theory the gases would escape out the hole and heat the Therm–O–Disc switch, which should have shut off the furnace. However, because the switch was mounted on the outside, cooler room air could flow around it and dilute the temperature of the flue gases escaping from the Heatnapper. The parties refer to the difference in temperature between the inside and outside of the Heatnapper as a "thermal lag." According to Therm–O–Disc, the real defect was this thermal lag; the Therm–O–Disc switch would have worked fine if it had been given the chance.

Therm–O–Disc notes that five experts tested the switch after the Heatnapper was removed from the Gannon home. According to Therm–O–Disc, all five experts found that the switch "functioned," that is, that the switch opened when heated. Therm–O–Disc's 12(e) Statement ¶ 14. Moreover, Donald Schmitt, a Therm–O–Disc engineer and one of the five experts, found that the switch opened at 252.1°F, well within the range specified by Barth and Hy–Temp, 250°F plus or minus 6°F.[3] The plaintiffs argue that the deposition testimony presented by Therm–O–Disc does not clearly show that the switch "functioned" as it should have, but we disagree. All five experts testified that the Therm–O–Disc switch opened when heated. *See* Barth Dep. at 149. ("It turned off fine when I tested it, or it turned off the appli-

---

2. The parties correctly assume that Illinois law applies to this case. Under the Illinois choice of law rules, which we must apply while sitting in diversity, the law of the state where the injury occurred applies in a tort case, unless Illinois has a more significant relationship with the occurrence and with the parties. *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593, 595 (1970); *see also Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 526 (7th Cir.1981). Since the plaintiffs' injuries occurred in Illinois, Illinois tort law will apply under either part of the test.

3. The plaintiffs argue that the materials filed for this motion do not clearly show that Barth and Hy–Temp specified the temperature range. We disagree. Barth stated in his deposition that he gave Therm–O–Disc "the manufacturer's and temperature requirements." Barth Dep. at 53. The plaintiffs have not pointed to any evidence to indicate that Therm–O–Disc had any input into the selection of the temperature range, so we must conclude that it was selected by Barth and Hy–Temp.

ance, it opened, the safety switch opened."); Bambenek Dep. at 46 (surface temperature when switch opened was 250°F, plus or minus 25°F); Owen Dep. at 62 ("reasonable to conclude that [switch] was operating within its normal range of expected temperatures"); Schmitt Dep. at 56 (opening temperature was 252.1°F). The Suchovsky deposition is perhaps somewhat less compelling. Suchovsky did not indicate at what temperature the switch opened and stated that it took four hours to open. Suchovsky Dep. at 79. But Suchovsky did get the switch to open and suggested that it took so long because he was testing the switch slowly to see where the "trip point" was. *Id.* In light of the depositions of the other experts, and because the plaintiffs have pointed to no other evidence to indicate that the switch was defective in and of itself, we conclude that the Suchovsky deposition presents, at best, a weak factual support. The Seventh Circuit has recognized that summary judgment may be used to weed out such weak factual claims. *Collins v. Associated Pathologists, Inc.*, 844 F.2d 473, 476 (7th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). Accordingly, we conclude that the Therm–O–Disc switch was not defective in and of itself.

■ Therm–O–Disc argues that this should be the end of our inquiry. According to Therm–O–Disc, the manufacturer of a component part should not be held liable if it supplies the component according to the purchaser's specifications, even if the purchaser subsequently assembles the part in a way that creates an unreasonably dangerous condition. As a general rule, this is true. *See Loos v. American Energy Savers, Inc.*, 168 Ill.App.3d 558, 563, 119 Ill. Dec. 179, 183, 522 N.E.2d 841, 845 (4th Dist.1988); *Curry v. Louis Allis Co.*, 100 Ill.App.3d 910, 914, 56 Ill.Dec. 174, 178, 427 N.E.2d 254, 258 (1st Dist.1981). The general rule makes sense in most cases, since the component maker usually exercises no control over how the component part is used. *See Loos*, 168 Ill.App.3d at 563, 119 Ill.Dec. at 183, 522 N.E.2d at 845; M. Shapo, *The Law of Products Liability* ¶ 12.03[7][c] at 12–20 (1987). However, the general rule

gives rise to a corollary: the component maker can be held liable if it does control or influence how the component is incorporated into the final product. In addition, Illinois courts determine defectiveness by looking at the intended or known use. *Dunham v. Vaughan & Bushnell Manufacturing Co.*, 42 Ill.2d 339, 342, 247 N.E. 2d 401, 403 (1969); *Kokoyachuk v. Aeroquip Corp.*, 172 Ill.App.3d 432, 437, 122 Ill.Dec. 348, 350, 526 N.E.2d 607, 609 (1st Dist.1988). Therefore, a component maker can be held liable if its component is defective for a known use, *Thomas v. Kaiser Agricultural Chemicals*, 74 Ill.App.3d 522, 529, 30 Ill.Dec. 273, 279, 392 N.E.2d 1141, 1147 (4th Dist.1979), *aff'd*, 81 Ill.2d 206, 40 Ill.Dec. 801, 407 N.E.2d 32 (1980), and a component maker who follows the specifications of the finished product producer can be held liable if the specifications are "obviously dangerous," *Loos*, 168 Ill.App. 3d at 564, 119 Ill.Dec. at 183, 522 N.E.2d at 845. Accordingly, we must consider whether any of the evidence produced in discovery tends to prove that Therm–O– Disc controlled or influenced the design of the Heatnapper, and whether it knew how Hy–Temp would use its switch.

■ We conclude that the evidence produced by the plaintiffs is sufficient to survive summary judgment. Plaintiffs' evidence suggests that Therm–O–Disc influenced the design of the Heatnapper. For example, in 1979, a Therm–O–Disc salesman visited the Hy–Temp plant and reported in a memorandum that he had recommended an enclosed bimetal disc, rather than an exposed one. Plaintiffs' Exh. 46. (Apparently the salesman recommended the enclosed disc because the exposed disc could be contaminated by gases from the vent.) In addition, the salesman recommended silver contacts with gold overlays. *Id.* Likewise, in a later memorandum, a different Therm–O–Disc salesman indicated that he had consulted with the Hy–Temp plant manager and then stated, "The incorporation of leads into our 44T device would be most desireable [sic] so I would like for Chuck Eaton to review this with Engineering to see if this can be accomplished."

Plaintiffs' Exh. 47. It is possible that these salesmen did not really influence how the Therm–O–Disc switch was incorporated into the Heatnapper, but rather acted merely as order takers. Certainly, it would not be surprising if the salesmen bolstered their accomplishments for the benefit of their superiors in the home office. But we think that a jury could find otherwise, and in a summary judgment motion, all the facts must be construed in favor of the non-moving party. *Richardson v. Penfold,* 839 F.2d 392, 394 (7th Cir.1988).

Moreover, the first sales memorandum referred to above indicates that Therm–O–Disc knew from the start how its switch would be used. The salesman described the Heatnapper this way: "The 60T manual reset (safety switch) is mounted on the side of the vent over an open hole. If for some reason the damper did not open, the heated fuel gases would go through the hole heating the disc case. The 60T manual reset is calibrated at about 250°F." Plaintiffs' Exh. 46. This memorandum indicated that Therm–O–Disc knew that the switch would be mounted on the side, and the plaintiffs' expert testified in his deposition that this was one of the defects in the Heatnapper. Bambenek Dep. at 76 ("The best solution to the problem is relocating the Therm–O–Disc from the Heatnapper itself, to the bottom of the draft diverter, so that the safety switch cuts off the burner when an excess of amount of exhaust gases are discharged into the basement."). Accordingly, a jury could conclude that the Therm–O–Disc switch was defective for a known use, and summary judgment is therefore inappropriate.[4]

### Conclusion

For the foregoing reasons, Therm–O–Disc's motion for summary judgment is denied. It is so ordered.

---

**4.** In an attempt to bolster their case, the plaintiffs included an affidavit from their expert, which was executed after this Court closed discovery and apparently only after Therm–O–Disc moved for summary judgment. Therm–O–Disc argues that we should disregard this affidavit since it was executed after the end of discovery. In deciding this motion, we did not consider the affidavit, so we need not decide the issue.